### 4943.   UNDERWOOD *v.* THE STATE.

"Courts should liberally construe the constitutional provision against compelling the accused to be a witness against himself, and refuse to permit any first or doubtful steps which may invade his rights in this respect."

(*a*) Where a person was arrested without a warrant, on suspicion of keeping on hand intoxicating liquors in his place of business, and the police officers, while holding him in illegal custody, violently seized his person and, against his utmost resistance, took from his pocket the keys to his iron safe, and with the keys unlocked the safe, and found therein intoxicating liquors, testimony on his trial for the offense of keeping intoxicating liquors on hand at his place of business, as to the finding

of the liquors in his safe, should have been excluded, because the evidence was wrongfully obtained by the officers, in criminal violation of the law, by an unlawful search and seizure, following an unlawful arrest, and the accused was thus compelled to give evidence tending to criminate himself, in violation of the constitution.

DECIDED AUGUST 15, 1913.

Accusation of sale of liquor; from city court of Americus—Judge Harper. April 26, 1913.

*C. R. Winchester, L. J. Blalock,* for plaintiff in error.

*Zach. Childers, solicitor,* contra.

HILL, C. J.   Underwood was convicted of a violation of the Penal Code, § 426, in keeping on hand at his place of business intoxicating liquors, and, his motion for a new trial having been overruled, he excepted. From the evidence it appears that the chief of police, with other policemen, went to the place of business of the accused, without a warrant, and instituted a search for intoxicants. While this search was in progress the accused closed and locked his iron safe. This aroused the suspicion of the chief of police, and he ordered the accused to open the safe for inspection. The accused refused to do so, and the officer thereupon, without a warrant, arrested him on suspicion, and took him to the police barracks, leaving a policeman in charge of the storehouse. At the police barracks, in the presence of the solicitor of the city court and of several policemen, the chief ordered the prisoner to give up his keys to the safe. Again the accused refused to do so, and thereupon the officers caught hold of him, and, forcibly and against his will and protest, overcoming by violence his resistance, took the keys from his pocket. Leaving the accused in custody at the barracks, the chief hurried to the storehouse, securing on his way the services of a locksmith, and ordered the locksmith to turn the combination of the safe; and when this was done the officer unlocked the safe with the keys he had secured from the person of the accused for that purpose, and found in it 114 pints of whisky, which he seized. Based upon the evidence thus obtained, a warrant was sworn out against the accused, and an accusation was filed, on which he was tried and convicted. On the trial the accused objected to the introduction of the testimony as to the finding of the liquor in his safe; and the admitting of this testimony is the subject of the controlling assignment of error.

The specific objection made to the admission of the testimony as

to the finding of the liquor was that the evidence was obtained by the officers while the accused was under an illegal arrest and by means of a key forcibly taken from his person, and that therefore he was compelled to give testimony tending to criminate himself, in violation of the constitutional provision that "No person shall be compelled to give testimony tending in any manner to criminate himself." Article 1, section 1, paragraph 6, of the constitution of this State (Civil Code, § 6362). This constitutional provision, and the other of kindred import, that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated" (article 1, section 1, paragraph 16; Civil Code, § 6372), had the dignity of maxims in the earliest days of English history, and were brought, with other fundamental principles of the common-law system of England, by our ancestors to America as a part of their birthright. In other words, these constitutional restrictions are but the expression of the unwritten common-law rights which had come to be recognized in England, in revolt against the thumbscrew and rack of early days. *Marshall* v. *Riley,* 7 *Ga.* 367; Thornton v. State, 117 Wis. 338 (93 N. W. 1107, 98 Am. St. R. 924). As to the application of these fundamental principles the decisions of the courts are in great conflict and in some confusion. Two distinct lines of interpretation have been announced by the courts of this country. One is a liberal construction of these constitutional guarantees in favor of the rights of the citizen, and the other is a literal and restricted construction, confining the application of the principle within very narrow limits. The latter construction may be stated generally as follows: "Though papers and other subjects of evidence may have been illegally taken from the possession of the party against whom they are offered, or otherwise unlawfully obtained, this is no valid objection to their admissibility if they are pertinent to the issue. The court will not take notice how they were obtained, whether lawfully or unlawfully; nor will it form an issue to determine that question." 1 Greenleaf on Evidence (16th ed.), § 245a. In equivalent phraseology this rule has been enunciated by the majority of the courts of final resort. It was said by the Supreme Court of Illinois, in the case of *Gindrat* v. *People,* 138 Ill. 103 (27 N. E. 1085), that courts in the administration of the

criminal law are not accustomed to be oversensitive in regard to the sources from which evidence comes, and will avail themselves of all evidence that is competent and pertinent, regardless of how it was obtained.  Courts which have adopted this latter construction hold that the provision relating to self-crimination is strictly testimonial; in other words, that it is applicable to the accused only as a witness, and is directed to positive, overt acts on the part of the accused personally, and does not include acts of other persons.  One learned authority expresses this view of the rule as follows:  "It seems to us an unfounded idea that the discoveries made by the officers and their assistants, in the execution of process, whether legal or illegal, or where they intrude upon a man's privacy without any legal warrant, are of the nature of admissions made under duress, or that it is evidence furnished by the party himself upon compulsion.  The information thus acquired is not the admission of the party, nor evidence given by him in any sense.  The party has in his power certain mute witnesses, as they may be called, which he endeavors to keep out of sight, so that they may not disclose the facts he is desirous to conceal.  By force or fraud access is gained to them, and they are examined, to see what evidence they bear.  That evidence is theirs, not their owners'."  State v. Flynn, 36 N. H. 64.  Mr. Wigmore, in his treatise on Evidence, takes this view of these constitutional restrictions, citing many decisions in support of his contention and combating the soundness of the decision of the Supreme Court of the United States announcing a contrary opinion, in the case of Boyd v. United States, 116 U. S. 616 (6 Sup. Ct. 524, 29 L. ed. 746).  4 Wigmore on Evidence, §§ 2251-70.

Liberal construction in favor of the rights of the citizen has been adopted by this court, beginning with the case of *Hammock* v. *State,* 1 *Ga. App.* 126 (58 S. E. 66), where it is held that, "When by an unlawful search and seizure, under an illegal arrest, a person is compelled by an officer of the law to furnish incriminating evidence against himself, such evidence is not admissible against him in a criminal prosecution."  In the *Hammock* case Judge Powell calls attention to the fact that the decisions of the Supreme Court of this State, in the interpretation of these constitutional restrictions, are not in absolute harmony, and declares:  "If we were untrammeled by some of these decisions, our own views of the sacred char-

acter of these constitutional rights of the private citizen might induce us to extend the rule further than we do." He then endeavors to harmonize the apparently conflicting decisions of the Supreme Court, and concludes with the statement that the ruling in the *Hammock* case is not in conflict with any of the decisions of that court. Without extending the discussion along this line, and omitting any effort to harmonize conflicting decisions, we put our opinion in the present case, under the facts, on the decisions in *Day* v. *State,* 63 *Ga.* 668, *Evans* v. *State,* 106 *Ga.* 519 (32 S. E. 659, 71 Am. St. R. 276), and *Hammock* v. *State,* supra. In the *Day* case it was held that "evidence that a witness forcibly placed defendant's foot in certain tracks near the scene of the burglary, and that they were of the same size, is not admissible. A defendant can not be compelled to criminate himself by acts or words." Chief Justice Warner, as was his custom, briefly disposed of the question by the statement that such testimony was in violation of the constitutional provision that "no person shall be compelled to give testimony tending in any manner to criminate himself." In the *Evans* case, supra, the *Day* case was referred to and approved, and it was held that "evidence which was offered by the State and admitted, showing that the accused, while not under legal arrest, had been compelled to put his hand in his pocket and surrender a pistol, thus disclosing that he was violating the law, was not admissible on the trial of such person for the offense of carrying a concealed weapon, alleged to have been committed on that occasion;" the decision being put squarely upon the constitutional provision referred to in the *Day* case. Justice Cobb, in the *Evans* case, attempts to harmonize the apparently conflicting decisions of the Supreme Court on this subject, and he deduces from all the decisions this rule: that "the law in this State is that evidences of guilt found upon a person under legal arrest may be used in evidence against him; but that where a person not in legal custody is compelled to furnish incriminating evidence against himself, the evidence is not admissible." In the *Hammock* case, supra, where the facts were identical with those of the *Evans* case, Judge Powell, speaking for the court, said: "Under the constitution, persons are protected against unlawful searches and seizures, and also against being compelled to give testimony tending in any manner to incriminate themselves. A violation of the former right does not necessarily

render evidence, incidentally disclosed thereby, inadmissible; a violation of the latter right does. When the act in question is a concurrent violation of both rights, the person is none the less to be protected." In other words, in the *Hammock* case it is held that the evidence was inadmissible under the constitutional restriction against unlawful search and seizure of the person, as well as under that provision which prohibits the compulsion from the accused of criminating evidence against himself. Where the arrest is legal, evidence obtained by search and seizure is admissible; where the arrest is illegal, evidence thus obtained is inadmissible. It may be stated that there are many decisions in conflict with the *Day* case, the *Evans* case, and the *Hammock* case, on the same state of facts. The majority of these are gathered in a note to the case of *State* v. *Turner,* in 136 Am. St. R. 135 et seq.

In our opinion there is no substantial difference in the facts of the present case and those of the three cases above relied upon. Here the accused was arrested without a warrant, on suspicion. His premises were searched without a warrant, on suspicion. When he refused to open his safe at the command of the officer, he was arrested and taken to the police barracks. His custody was wholly illegal, and the officer was guilty of the offense of false imprisonment. When he reached the police barracks the chief of police and other officers again demanded of him his keys, which he declined to give up. The officers then forcibly took from him his keys, overcoming his utmost resistance. In other words, they committed an unpardonable trespass, for the purpose of finding evidence tending to incriminate him. In endeavoring to find evidence sufficient to establish the crime which they suspected he was guilty of, these officers of the law committed much graver offenses than the one of which they suspected the accused. He was suspected of keeping intoxicating liquors on hand at his place of business, an offense malum prohibitum. They illegally deprived him of his liberty, they searched his premises illegally, they made an assault and battery upon his person, and, in so doing, they violently pulled down the constitutional bulwarks which protected him as a citizen, both as to his person and as to his property. The language of Chief Justice Bleckley in *Rusher* v. *State,* 94 *Ga.* 366 (21 S. E. 594, 47 Am. St. R. 175), is here pertinent: "The law ought to hold out no encouragement to violent and lawless men to commit crime for the

sake of detecting a previous crime and bringing the offender to punishment. The law should never suffer itself to become an enemy or antagonist to its own reign." Here, under the facts, was a multiplication of crimes committed by the officers of the law, crimes against the inherent rights of the citizen, secured by the constitution of this State, in order that a comparatively venial offense, made an offense by statute, but not inherently an offense, could be detected. If such means could be adopted in the detection of crime and were approved by the courts, the law would not only be antagonistic to its own reign, but a state of anarchy would exist. In the case of *Rusher* v. *State,* supra, while it is held that the rule is well established that independent facts discovered in consequence of a constrained confession made by a prisoner are admissible in evidence, the following important qualification is made to the rule: "unless it appears that criminal violence was used in procuring the confession or making the discovery." The inference is clear, from this qualification, that where the incriminating facts are discovered by criminal violence, they are not admissible against the accused. Here the keys were taken from the person of the accused by a criminal assault and battery made upon him by the officers of the law.

It is said by counsel for the State that the forcible taking of the keys from the accused was not material; that the discovery of the liquors in his storehouse was an independent fact, and admissible as such under the well-established law on that subject, and that the means adopted to make the discovery, or, in other words, to open the safe, were immaterial; but in the *Day* case, supra, the correspondence of the tracks to the foot of the accused, and in the *Hammock* case, supra, and in the *Evans* case, supra, the discovery of a pistol on the person of the accused, were independent facts, but nevertheless they were held to be inadmissible, because the accused in these cases were under illegal arrest, and the evidence against them was obtained by compulsion, while they were held in unlawful custody. True, the officers might have gone to the safe and, without a warrant, broken it open; and in that event the testimony probably might have been admissible; but they did not pursue that course. They forced the accused to give up his keys. In other words, they forced him to give into their possession the means of discovering the incriminating fact. It is wholly immaterial that they might have discovered the incriminating fact otherwise. We are simply dis-

cussing the method employed by the officers to compel the accused to furnish the means whereby the incriminating evidence was discovered. On the trial of Aaron Burr, 1 Burr's Trial, 245, it was held, in substance, by the great Chief Justice Marshall, that the prohibition against one's being compelled to be a witness against himself should not be limited to the mere exclusion of oral statements against himself; that if a link in the evidence which he could not be required to furnish were to be furnished by some fact, document, or property which he had a right to keep secret, the mantle cast about him by the constitution would be as much rent as if he were forced to furnish it by word of mouth.

The two provisions of the constitution which we have been discussing appear in the fundamental law of every State of this Union, as well as in the Federal constitution. They are the sacred civil jewels which have come down to us from an English ancestry, forced from the unwilling hand of tyranny by the apostles of personal liberty and personal security. They are hallowed by the blood of a thousand struggles, and were stored away for safe-keeping in the casket of the constitution. It is infidelity to forget them; it is sacrilege to disregard them; it is despotic to trample upon them. They are given as a sacred trust into the keeping of the courts, who should with sleepless vigilance guard these priceless gifts of a free government. We hear and read much of the lawlessness of the people. One of the most dangerous manifestations of this evil is the lawlessness of the ministers of the law. This court knows and fully appreciates the delicate and difficult task of those who are charged with the duty of detecting crime and apprehending criminals, and it will uphold them in the most vigilant legal discharge of all their duties, but it utterly repudiates the doctrine that these important duties can not be successfully performed without the use of illegal and despotic measures. It is not true that in the effort to detect crime and to punish the criminal, "the end justifies the means." This is especially not true when the means adopted are violative of the very essence of constitutional free government. Neither the liberty of the citizen nor the sanctity of his home should be invaded without legal warrant. Suspicion is no substitute for a legal warrant, and the badge of authority is the emblem of law and order, and gives no right to the wearer to arrest without warrant, imprison without authority, and torture without mercy. Any

compulsory discovery of self-incriminating evidence is abhorrent to a proper sense of justice and is intolerable to American manhood. What is commonly known as the methods of the "third degree," so frequently used by zealous officials or interested detectives, may be an appropriate part of that jurisprudence which holds that every man is guilty when accused of crime until he proves his innocence, but it has no place in the jurisprudence of a land where the cardinal principle of humanity and justice is that every man is presumed to be innocent until his guilt is shown by legal evidence beyond a reasonable doubt. These arbitrary methods of discovering crime are subversive of the fundamental principles of law, destructive of the indefeasible rights of personal liberty, personal security, and private property, and place at the mercy of every petty official and conscienceless criminal the life, liberty, and reputation of the citizen. They flourished in the dark days of the Star Chamber and the Spanish Inquisition, but could not exist in the clear atmosphere of political liberty and personal freedom. Besides, these instruments of oppression are successful only when used against the ignorant or the wicked. The former can not combat the artifices and tricks of the experienced official, and the latter will not hesitate to involve the innocent to escape detection. Therefore courts of justice will not approve such methods to discover crime, and the law, seeking pure and impartial sources of evidence, will refuse to admit compulsory confessions of guilt, and condemns as dangerous, untrustworthy, and without probative value testimony against others obtained by the use of physical torture or mental coercion.

In the instant case, the only evidence of guilt having been discovered in the forcible violation of the constitutional provision that no man shall be compelled to give testimony that in any manner tends to criminate himself, the conviction was unlawful.

*Judgment reversed.*