### 52645. HATCHER v. THE STATE.

McMurray, Judge.

Defendant was indicted for burglary of a hotel room. He was sentenced to serve 20 years. The sole complaint involves the motion to suppress the evidence and the allowance of this evidence to be used against him on the trial.

A burglary had occurred at the hotel, and in investigating same, the officers' information centered on the occupant in a hotel room. The articles reported as stolen were observed in plain view in the room when the defendant opened the door in response to the officer's knock. The defendant then made an admission that he had just purchased the goods from another person in the hotel for $10. The defendant invited the officers into the room and the goods were in plain view when the officers entered the room. The guest from whom the articles (portable television set, suitcase and coat) had been stolen was called and identified those items. The defendant was then arrested.

The evidence sought to be suppressed consists of the stolen goods which were found in the defendant's own room.

While the officers were not absolutely certain the defendant was the culprit, and their attempt to locate him had centered on this hotel room, nevertheless, it could have amounted to hot pursuit or a legitimate inquiry of

the hotel guest. See in this connection *Brooks v. State,* 129 Ga. App. 393 (199 SE2d 578), which is somewhat similar both as to the facts and law. When the door was opened, the alleged stolen articles were observed in the room. There was no search here as was the case in Harris v. United States, 390 U. S. 234 (88 SC 992, 19 LE2d 1067); Frazier v. Capp, 394 U. S. 731, 732 (4) (89 SC 1420, 22 LE2d 684); Ker v. California, 374 U. S. 23, 43 (83 SC 1623, 10 LE2d 726); in which the plain view doctrine is discussed.

There was no illegal search and seizure as the officers were authorized to be where they were when they observed the stolen goods. The trial judge as a finder of fact on the motion to suppress was authorized to resolve any conflicts and find that the stolen goods were properly observed when the defendant voluntarily opened the door. *Brand v. State,* 129 Ga. App. 747, 749 (201 SE2d 180); *Brooks v. State,* 129 Ga. App. 393 (2), supra.

*Judgment affirmed. Bell, C. J., Deen, P. J., Marshall and Shulman, JJ., concur. Quillian, P. J., Webb, and Smith, JJ., dissent.*

ARGUED SEPTEMBER 8, 1976 — DECIDED MARCH 18, 1977 — REHEARING DENIED MARCH 31, 1977 — 

*J. Robert Daniel,* for appellant.
*Fred M. Hasty, District Attorney, W. Donald Thompson, Walker P. Johnson, Jr., Assistant District Attorneys,* for appellee.

SMITH, Judge, dissenting.

In 1913 Chief Judge Benjamin Hill of this court observed, "It is not true that in the effort to detect crime and to punish the criminal, 'the end justifies the means.' This is especially not true when the means adopted are violative of the very essence of constitutional free government." *Underwood v. State,* 13 Ga. App. 206, 213 (78 SE 1103).[1] Similarly, in the words of Justice

---

[1] This and similar cases from a remarkable period in the early history of this court are discussed in Wilkes, "A

Frankfurter speaking for the Supreme Court of the United States in Wolf v. Colorado, 338 U. S. 25, 27 (69 SC 1359, 93 LE 1782): "The security of one's privacy against arbitrary instrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society . . . The knock at the door, whether by day or by night, as a prelude to a search, without authority of law but solely on the authority of the police, did not need the commentary of recent history to be condemned. . ." And let us not forget the classic Fourth Amendment synopsis provided by Justice Stewart in Coolidge v. New Hampshire, 403 U. S. 443, 454 (91 SC 2022, 29 LE2d 564): "Thus the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn'; and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' '[T]he burden is on those seeking the exemption to show the need for it.' In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values it represents may appear unrealistic or 'extravagant' to some. But the values were those of the authors of our fundamental constitutional concepts. In times not altogether unlike our own they won—by legal and constitutional means in England, and by revolution on this continent—a right of personal security against arbitrary intrusions by official power. If times have changed, reducing everyman's scope to do as he pleases in an urban and industrial world, the changes have made the values served by the Fourth Amendment more, not less, important."

It is appropriate to recollect the timelessness and continued vitality of these Fourth Amendment protections in cases like that before us now where the

Most Deplorable Paradox: Admitting Illegally Obtained Evidence in Georgia—Past, Present, and Future," 11 Ga. L. Rev. 105 (1977).

state is seeking justification of a warrantless seizure by shoehorning the circumstances of the seizure into one of the narrow warrant requirement exceptions. Specifically, this case involves an application of the "plain view doctrine" to determine whether the inculpatory evidence underlying the appellant's burglary conviction was properly seized. The material facts adduced at a hearing on the appellant's motion to suppress the evidence are as follows:

In the predawn hours of December 4, 1975, Macon police officers Hall and West responded to a call to investigate a reported hotel room burglary. At the hotel they were met by a bellhop who took them to the second floor room of tenant Arthur Peyton who told the officers that he had observed a black male enter a room on the second floor and leave with a portable television, a suitcase, and a coat. He followed the man and saw him enter room 419 with the items. Armed with this information, but not with a search warrant, the officers, accompanied by the bellhop, went to room 419, knocked on the door, identified themselves as police officers, and received no response. There is conflict in the testimony as to what happened at this point, and we are bound by the trial court's resolution of any factual disputes on a motion to suppress. *Brisendine v. State,* 130 Ga. App. 249 (1) (203 SE2d 308). The inescapable conclusion to be reached from an examination of the witnesses' testimony and the trial court's statements at the hearing is that the court concluded that the bellhop used his master key to unlock the door and the door then was opened from the inside. Both of the police officers and the bellhop testified at the hearing. Mr. Turner, the bellhop, and Officer Hall each testified that the bellhop unlocked the door. Officer West testified that the bellhop took out his key but did not *open* the door; he never denied that the bellhop *unlocked* the door, except when he agreed with the conjunctive statement that the bellhop did not "unlock the door *and* open it." Thus, there seems to be no conflict in the evidence on this point which is central to the legal analysis of this case. The trial court, indeed, viewed the conflict to be whether the door was unlocked at police direction, not whether the bellhop had in fact unlocked

the door. The court stated in the record, ". . . it seems to me they unlocked the door into somebody's home . . ." As will be demonstrated below, the fact that the bellhop unlocked the door, more than any other one fact, but specially in conjunction with the other circumstances, renders the seizures which took place illegal. Unhappily, the majority opinion fails even to mention this crucial fact.

It is not explicitly stated in the record, but the court obviously concluded that the door had been unlocked on the bellhop's own volition without request from the police officers. There also was conflict in the testimony as to who opened the door after it was unlocked—the bellhop, one of the officers, or the appellant. The court concluded that the appellant opened the door. There is no explicit statement of the court's findings of fact so it is important to view the transcript of the evidence and the court's comments as a whole to determine what conclusions were reached. Therefore, all parts of the testimony and all of the court's comments relevant to who unlocked the door at whose direction and who opened it are set forth below:

Officer West, witness for the state, *direct examination:* "A. We then went to Room 419, knocked on the door several times and Mr. Hatcher asked who it was. We advised him that it was the police—come open the door. Q. All right, what happened then? A. He wouldn't come to the door at first, seemed maybe 30, 35, 40 seconds, then the bellhop boy took out his key and was going to open the door and, to my recollection, Mr. Hatcher opened the door and we were standing at the door at this time."* * * *Cross examination:* "Q. O.K. And so [the bellhop] got out his key and he opened the door then? A. He got out his key but it is to my recollection that he didn't open the door. * * * Q. And you say again that the man on the inside, who was subsequently identified as Richard Hatcher, had opened the door? A. To my recollection.* * * Q. . . . Then you said that [the bellhop] did not admit you to the room. You say he just got the key out but he didn't unlock the door and open it? A. To my recollection. Yes, sir." * * *

Doug Turner, bellhop, witness for the appellant, *direct examination:* "Q. Did the police say anything? A. Sure. They knocked on the door, called him. Q. O.K. And there was no answer to the door? A. No answer. Q. So what

happened then? A. I opened the door. Q. You unlocked the door and opened it up? A. That's right. And he was standing behind the door. Q. And you are absolutely sure that you opened—that when he wouldn't answer, you opened the door and opened it up? A. That's right. * * * Q. With that aside, did he—you said he did say come on in after you had unlocked the door? A. That's right. Q. But it was not before he had said come on in that you and the police officers actually entered into his room? A. I had to open the door before he would let us in. Q. O.K. But you were the one who actually opened the door? A. I opened the door." * * * *Cross examination:* "Q. So you unlocked the lock with your key and you specifically recall that you reached—took the handle in your hand and turned it to open the door? A. Well, . . . Q. . . . [inaudible] ask you about that? A. Well, what happened, after the officer knocked on the door—almost tore it down—couldn't get in so I tried, well I opened it. When I opened the door, this guy Hatcher was hid behind the door then—so I let them walk in first. I opened the door and they walked in first. Q. You mean you unlocked the door? A. That's right. Q. But you didn't open the door and push it open? A. Right, I unlocked it. Q. Somebody else pushed it open? A. Well, I pushed it open a little bit and they finished it up. Q. You're sure the defendant didn't open the door—pull it open after you unlocked it? A. No sir. You mean Hatcher? He didn't. He was hid in the room." * * * *Re-cross examination:* Q. Mr. Turner, did anybody tell you to unlock that door? A. Officers. Q. Beg your pardon? A. The officers. Q. The officers said unlock it? A. Right." * * *

Officer Hall, witness for the state, *direct examination:* "Q. Did you knock on the door of 419? A. Yes, sir. Q. What happened when you—ya'll knocked on the door? A. We knocked on the door. Could hear some noises . . . [inaudible] the door and knocked again and said, 'Police, open the door.' And so the bellhop had a pass key and stuck it in the lock and unlocked the door and stepped back. Did not open the door, just turned the lock but knocked on the door again and the subject inside opened the door." * * * *Cross examination:* "Q. What happened when—tell me exactly what happened when you got up there to the room. A. [The bellhop] said this is where the

guy lives. We knocked on the door—could hear some noises, the door did not open. We knocked again, identified ourselves as police officers. Still hear the noises but the door didn't open. The bellhop stuck a key in the lock and turned the lock . . . [inaudible] deadlock type of thing. He stepped back. Tapped on the door again and the door was opened from the inside. Mr. Hatcher was standing there with his hand on the door knob. The door swings to the left, if I'm not mistaken." * * *

After the close of all testimony, argument before the court: "The Court: Well, the problem that the Court has got here, Mr. Thompson, is to resolve the conflict in the testimony about who unlocked the door at whose direction. Seems to me that if the door was unlocked at the direction of the police, then you've got an illegal search. Mr. Thompson: Is your honor saying that if the door was unlocked but not opened at the direction of the police . . . The Court: Yes sir. I would think so. I will be glad to hear from you on that, *but it seems to me they unlocked the door* into somebody's home and this room was this man's home. It is an invasion of the privacy of that home just as much as it would be opening the door. That's making it available to be opened. * * * I'm saying if he unlocked the door at the direction of the police. If he unlocked it on his own volition, I doubt we've got an illegal search but if he unlocked it at the direction of the police, I think you have." (Emphasis supplied.)

(Argument from Mr. Thompson) "The Court: You may be right. So then we are faced with the conflict between the testimony of the bellhop on the one hand who says the police told him to open the door and the testimony of the police officers, on the other hand, who say they did not."

At this point the court clearly views the conflict to be whether the police directed the bellhop to unlock the door. The court has undoubtedly concluded that the bellhop did, in fact, unlock it. At this point, argument from the attorneys steered the inquiry to the question of who opened the door after it was unlocked, and the court concluded the hearing with the following remarks:

"The Court: Well, of course, if the defendant did not open the door himself, the proper course for the officers

would have been to have gotten the search warrant. They are not authorized to go into a hotel room anymore than they are authorized to go into somebody's home. I think they had probable cause to get a search warrant. In this case, they could have left one officer there and sent another to get a search warrant and they could have come back with one. So that if the defendant himself did not open that door, then the course for the officers was to go get a search warrant and there is conflict in the evidence as to whether or not the defendant opened the door himself or not. The defendant himself presented one witness, the bellhop, and the Court's simply got to resolve the question of credibility of the testimony of all of those witnesses and I'm going to rule that the state has made out a proper case and deny the motion to suppress." (End of hearing.)

What did the court mean by ruling that the state had made out a proper case? From the context of the court's statements as set forth above, the court must have meant that the state proved to his satisfaction (1) the police officers did not direct the bellhop to unlock the door, and (2) the appellant opened the door from inside. These were the factual issues he viewed as conflicting, and this court is bound by them if supported by evidence. However, on the issue of whether the bellhop unlocked the door the court found no conflict, and, indeed, the record shows only a scant possibility of conflict on this point by way of Officer West's vague denials. In sum, Officer Hall made a clear and unequivocal statement that the bellhop unlocked the door; the bellhop made a clear and unequivocal statement that he unlocked the door; and Officer West, to the best of his "recollection," said the bellhop took out his key and the appellant opened the door, but he never denied that the bellhop had unlocked the door; and the court made repeated statements that the bellhop unlocked the door but it wasn't convinced the police had directed him to do so. The trial court's overruling the motion to suppress does not mean that this court must blind itself to proved facts which make the legal analysis differ. Appellate deference has been carried too far when the majority of this court ignores the fact that the bellhop unlocked the appellant's door.

Thus, the facts determined by the trial court, on

which this court must rest its legal analysis, are that the officers knocked on the door, and received no response; the bellhop unlocked the door with his master key; and the door then was opened by the appellant from within. When it opened the officers could see from the hallway the three items described by Mr. Peyton. They told the appellant they were investigating a burglary. Sometime thereafter the appellant allowed the officers to enter the room as he attempted to explain how he came to be in possession of the goods they had observed. The victim was located and brought to the room. After ascertaining from her that the items in the room belonged to her, the officers arrested the appellant and searched his person finding more incriminating items. The items discovered before and after the arrest were seized.

The appellant's motion to suppress was denied and the evidence was introduced at trial over his objection. All of the enumerations of error deal with the legality of the seizure of the items.

I. Application of the Plain View Doctrine.

A hotel room tenant reasonably may expect the same privacy and the same protections from unreasonable government intrusions as if he were in his own home. Katz v. United States, 389 U. S. 347 (88 SC 507, 19 LE2d 576); Stoner v. California, 376 U. S. 483 (84 SC 889, 11 LE2d 856). The warrantless seizure of items from the appellant's hotel room is justifiable under the Fourth Amendment only if the circumstances of the seizure fit within one of the recognized exceptions to the warrant requirement. Under the facts of this case the only arguably applicable exception, and the only one urged upon us by the state, is the exception founded upon the plain view doctrine. The doctrine was articulated in 1971 by Justice Stewart in a plurality opinion for the Supreme Court in Coolidge v. New Hampshire, 403 U. S. 443, supra. It was an attempt to pull together prior holdings approving warrantless seizures where police officers—while searching legally, while arresting, while in hot pursuit, or while otherwise legally present on private property—had happened upon, and seized, items suspected to be contraband or evidence of a crime. The doctrine, simply stated, is that it is constitutionally

reasonable for government authorities to seize objects come upon inadvertently during a valid intrusion. Complexities abound in Stewart's requirements that the doctrine applies only where there has been (1) a prior valid intrusion (2) leading to an inadvertent sighting (3) of items immediately apparent as evidence.[2] Equally perplexing is the question whether Stewart's opinion carried five votes and thus became the law of the land or carried four votes and therefore was merely persuasive. Brown v. State, 15 Md. App. 584, 586, n. 1 (292 A2d 762); cf. People v. McKinnon, 7 Cal. 3d 899, 911 (500 P2d 1097). Whatever the answer to that question, Stewart's formulation of the plain view doctrine is widely treated as the law in federal jurisdictions (e.g. United States v. Clark, 531 F2d 928 (8th Cir. 1976); Cook v. Johnson, 459 F2d 473 (6th Cir. 1972); United States v. Drew, 451 F2d 230 (5th Cir. 1971); United States v. Wright, 405 FSupp. 1236 (E. D. Tex. 1975)), in foreign jurisdictions (e.g., Shipman v. State, 291 Ala. 484 (282 S2d 700); Dixon v. State, 23 Md. App. 19 (327 A2d 516); Commonwealth v. Walker, 350 NE2d 678 (Mass. 1976); Barnato v. State, 88 Nev. 508 (501 P2d 643)), and, as examination of local cases shows, here in Georgia.

The purpose of the following review of "plain view cases" decided in Georgia is two-fold. First, it will demonstrate the incorporation—sometimes random, often piecemeal, but finally complete—of Coolidge's plain view doctrine into the law of this state. Second, it will identify the evolved interpretation of Coolidge's three limitations. The review is divided according to the three requirements: A-prior valid intrusion; B-inadvertence; C-immediate apparency.

A. Prior Valid Intrusion.

Those cases which have upheld plain view seizures either have expressly held, or have reported facts clearly

---

[2] A thorough discussion of these requirements, their purposes, and their legal precedents is presented in Moylan, The Plain View Doctrine: Unexpected Child of the Great "Search Incident" Geography Battle, 26 Mer.L.Rev. 1047 (1975).

indicating, that the seizure was subsequent to a valid intrusion. They are grouped below according to the type of intrusion.

*Intrusion pursuant to a search warrant.* A common example of plain view seizures is where, during the course of executing a search warrant, related items not named in the warrant are seized. In *Scott v. State,* 122 Ga. App. 204 (176 SE2d 481), a warrant was issued to search for tools used in an illegal abortion. The execution of the warrant provided the valid entry legitimizing the seizure of other nonspecified items which evidenced that abortions had been performed on the premises. A factually distinct but analytically similar situation arises when officers executing a warrant to search for items connected with one crime turn up items connected with a separate crime. Seizure of the latter items is justifiable, as illustrated by *Harp v. State,* 136 Ga. App. 897 (222 SE2d 623), where federal officers searching under warrant for gambling evidence turned up tools useful only for opening telephone coin boxes, a state crime. See also *Bryan v. State,* 137 Ga. App. 169 (223 SE2d 219). Occasionally, seizure of nonspecified items during a warrant search is analyzed under Section 3(e) of the Search and Seizure Act (Ga. L. 1966, pp. 567, 569; Code Ann. § 27-303 (e)) rather than under the plain view doctrine. The statute provides that "when the peace officer is in the process of effecting a lawful search" he may seize fruits or evidence of crimes even though the seized items were not listed in the warrant. No statute may authorize a constitutional violation, however, so this statute should be construed as laying down the same requirements for a seizure as the plain view doctrine. Indeed, searches which have been approved under the statute would have withstood the Coolidge tripartite test had they been subjected to it. Seizures were upheld under Section 3(e) in *Dugan v. State,* 130 Ga. App. 527 (203 SE2d 722), where searchers under warrant for marijuana found a large stack of television sets, stereos, and typewriters in the middle of a room; in *Pope v. State,* 134 Ga. App. 455 (214 SE2d 686), where searchers for gambling paraphernalia found marijuana in a chest in which gambling paraphernalia could have been hidden; and in *Campbell v. State,* 226 Ga. 883 (178

SE2d 257), where searchers for stolen rifles and clothing found jewelry in display cases, household appliances (some in original boxes), seven typewriters, and a large amount of cash, all in a home occupied by a crippled man and his mother. In each of the above cases, the search within the proper course and scope of the warrant supplied the prior valid intrusion; the items were not previously known to be present so that their discovery was inadvertent; and the items were immediately apparent as evidence or fruits of crime.

*Intrusion pursuant to arrest warrant.* An arrest warrant provided the justifiable entry leading to a plain view seizure in *Boyd v. State,* 133 Ga. App. 136 (210 SE2d 251), where officers went to Boyd's home to arrest him for auto theft. They suspected him of burglary, also, and while in his home they saw, and seized, a large quantity of stereo equipment and television sets reasonably suspected of being stolen.

*Legal detention of an automobile.* This category contains two legally distinct situations. One is where there is first a valid intrusion into an automobile and a seizable object then comes into open view; the other is where there is a valid reason to be standing outside an automobile looking in and an object is in open view within the automobile. In the former situation, the plain view doctrine justifies a seizure. In the latter, the view of the object, without more, never justifies its seizure. Rather, in many cases the exigencies of the situation (Carroll v. United States, 267 U. S. 132 (45 SC 280, 69 LE 543)), authorize an entry into the automobile for the purpose of seizing the sighted item.

The leading example of a valid intrusion into a vehicle prior to spotting a seizable object is the inventory search of a legally impounded automobile. In Harris v. United States, 390 U.S. 234 (88 SC 992, 19 LE2d 1067), after a proper inventory search of an impounded automobile, an officer who was locking up the car opened the front passenger door in order to roll up the window. Once into the car for this purpose, he saw an inculpatory registration card on the floorboard. Seizure of the card was upheld, the Supreme Court using the oft-quoted language that "objects falling in the plain view of an

officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." Harris, p. 236. Similar seizures were approved in *Brown v. State,* 235 Ga. 644 (220 SE2d 922) and *Lee v. State,* 129 Ga. App. 82 (198 SE2d 720). In *Brown,* the defendant consented to a search of the trunk of his automobile in which a stolen shotgun was found. After his arrest and the car's impoundment an inventory search led to the discovery of a pistol lying in open view on the rear floorboard. It was seized and used to link the defendant with a murder. In *Lee,* the defendant was arrested for driving under the influence and a subsequent inventory search of his impounded automobile led to the seizure of incriminating pills found in a partially open matchbox in plain view on the floorboard.

Cases involving entry into an automobile *after* contraband or evidence was spotted within often cite Harris v. United States, supra, as authority for the seizure despite its factual distinction. In these cases the plain view doctrine does not justify the seizure of the viewed items because the threshold of personal privacy which must be crossed to seize the item was not crossed *prior* to the sighting. In many of our cases the plain view doctrine has been applied to legitimate a seizure, but it is clear that the doctrine was used to justify the police officer's acquisition of probable cause to seize the item, and something more, usually exigent circumstances, allowed a physical crossing of the threshold of privacy to accomplish the seizure.

Thus, the analytical framework is first to determine whether the officer had a right to be looking into the vehicle (frequently the question will be whether he had a valid reason for stopping or detaining the vehicle) and next to determine whether that which he saw provided him with probable cause for a search of the vehicle or seizure of items within it. Finally, if probable cause existed after a rightful view, it must be determined if there was authority to enter the automobile, whether by warrant, or for protection of the officer, or because of exigent circumstances which threaten destruction or removal of the goods, or under any other recognized exception to the warrant requirement. Most often, the

threatened removal of goods located in an automobile will suffice as reason to seize them without a warrant.

Our cases have not always distinguished between the valid visual intrusion into an automobile which does no more than justify the officer's acquisition of probable cause to seize what he has seen, and the valid physical intrusion (such as in Harris) which allows immediate seizure of openly viewed evidence without further ado under the plain view doctrine. When there has been no physical intrusion antecedent to a plain view of evidence, the additional element of a legal reason to enter the vehicle must always be present. This distinction between the justifications for visual intrusion and physical entry into a vehicle is seen in *Caito v. State,* 130 Ga. App. 831, 835 (204 SE2d 765), where the defendant's car was stopped for speeding and the police officer saw marijuana in the glove compartment when the defendant opened it to find his vehicle registration certificate. This court correctly analyzed the legality of the marijuana's seizure as follows: "the observer had a right to be where he was at the time he inadvertently saw the contraband" (valid visual intrusion; this fulfills Coolidge requirements I and II); "it was immediately apparent to him that the vegetation was contraband" (this fulfills Coolidge requirement III *and* supplies probable cause for an entry into the car); "and there were exigent circumstances, that of a moving car" (exigent circumstances plus probable cause equals a valid warrantless physical entry). The exigent circumstances requirement was expressly recognized under similar facts in *Brisendine v. State,* 130 Ga. App. 249, supra.

Other cases have not expressly followed this three-step analysis, especially with regard to the third step, exigent circumstances; however, they uniformly involve mobile vehicles stopped on highways under circumstances where this court has consistently recognized that the exigencies of the setting foreclose the practicality of obtaining a warrant. Thus, assuming a priori the existence of exigent circumstances, the remaining requirements for a legal seizure are a valid visual intrusion leading to an inadvertent open view of evidence, the apparency of which supplies probable cause

for a seizure. In *Mobley v. State,* 130 Ga. App. 80 (202 SE2d 465), the nighttime stop of defendant's speeding vehicle was justified, but the seizure from the floorboard of a bag which was found to contain marijuana was not justified because the state had failed to prove that the officer could see the marijuana inside the bag *before* he seized it. Put another way, although the detention of the car followed by a look within constituted a valid visual intrusion, and although sighting the bag was inadvertent, the officer had no more than a naked suspicion that the bag contained contraband and naked suspicions do not add up to probable cause. The same analysis applies to *Humkey v. State,* 129 Ga. App. 750 (201 SE2d 190), where police officers admitted that they did not know until after its removal that a bag seized from the glove compartment of a parked car contained marijuana. Compare *Williams v. State,* 129 Ga. App. 103 (198 SE2d 683), where the officer testified that he saw on the back seat an open sack containing smaller plastic bags of apparent marijuana.

There must be legitimate detention of a vehicle prior to applying the above analysis to justify the seizure of items within it. This principle is illustrated by the holdings in *Swift v. State,* 131 Ga. App. 231 (206 SE2d 51), and *State v. Swift,* 232 Ga. 535 (207 SE2d 459). Law enforcement officers, on the weekend of a rock concert on Jekyll Island, set up a roadblock on an island access road for the stated purpose of checking for drivers' licenses, automobile inspections and registrations, fugitives, and runaways. The defendant's van was stopped and an officer claimed to have seen marijuana on the floorboard, which led him to search the van and seize a bag of marijuana from the glove compartment. This court held that the claimed purpose for the roadblock was merely a subterfuge and the true purpose was to search for drugs. Detention of the van for this purpose was illegal, and the subsequent discovery of drugs was therefore illegal. Although the court did not expressly analyze in plain view terms, it is apparent that the illegal detention negated the prior valid intrusion requirement. When the Georgia Supreme Court reversed this court it deferred to the trial court's determination that the roadblock was set up for legitimate reasons. Upon the factual setting of a

legal roadblock, the Supreme Court's analysis that the plain view of marijuana inside the legally detained vehicle gave probable cause for a search properly follows.

*Justifiable warrantless intrusion onto private property.* Just as with automobile cases, the cases involving plain view seizures from private property fall into two classes: first, there is the true plain view seizure where there is first a valid entry onto the property and then evidence is discovered in open view; second, there is the situation where evidence on the premises is in open view to an officer off the premises, and his view provides the probable cause which may couple with either a warrant or a warrant exception to provide authority for a physical entry onto the premises to seize the item.

Valid warrantless entries leading to proper seizures of evidence discovered in open view were found in *Gainey v. State,* 132 Ga. App. 870 (209 SE2d 687), where police officers seized evidence of a homicide after they entered the defendant's apartment in response to her call for help after her husband was shot, and in *Lentile v. State,* 136 Ga. App. 611 (222 SE2d 86), where agents entered a dwelling under exigent circumstances for the limited purpose of securing it and saw marijuana in open view. The opposite result was reached in *Brewer v. State,* 129 Ga. App. 118 (199 SE2d 109). There, officers went to a second-floor apartment to check out a complaint about loud noise and saw from the doorway a small cellophane package being thrown under a couch. The court found that this package was not seen until after an officer opened the front door of the apartment and crossed the threshold; thus, there was no valid prior intrusion or, as the court held in a Harris type analysis, when the officers saw the bag being thrown under the couch they "were . . . not entitled to be where they were. . ." *Brewer,* supra, p. 120.

The situation where evidence in open view is spotted from a vantage point outside the premises was clearly analyzed in *Lewis v. State,* 126 Ga. App. 123 (190 SE2d 123). Agents suspected the defendant of burglary and went to his residence to investigate. From the public roadway they could see a pickup truck on the defendant's property loaded with several items, including a hot water heater, which matched the descriptions of some of the

stolen items. Officers entered the premises to check the serial number of the hot water heater and when it matched the number of the stolen heater one officer left to obtain a search warrant while the other two remained close by to prevent removal of the goods. After the warrant was obtained several stolen items were seized. The court held that even though the items were in plain view from the roadway, the subsequent warrantless entry onto the property "was a trespass and unlawful" and "any information acquired by these officers *after* entry onto defendant's premises was unlawfully obtained. . ." *Lewis,* p. 126. Nevertheless, what the officers had seen *prior* to entry onto the premises was usable to support probable cause for a search warrant and since the pre-entry data, standing alone, amounted to probable cause, the warrant and seizure were upheld. See also *Black v. State,* 119 Ga. App. 855 (168 SE2d 916).

## B. Inadvertence.

The following reference to the Coolidge v. New Hampshire inadvertence requirement has twice appeared in our cases: "While a plurality of the Supreme Court has said that the discovery must be 'inadvertent,' . . . there is no definitive holding on this point." *Brisendine v. State,* 130 Ga. App. 249, 250 (203 SE2d 308); *Swift v. State,* 131 Ga. App. 231, 240 (206 SE2d 51) (Hall, P. J., dissenting). It is clear now, however, that the inadvertence requirement has been recognized as the law in Georgia and elsewhere. E. g., Martinez v. Turner, 461 F2d 261, 264 (10th Cir. 1972); People v. Eastin, 8 Ill. App. 3d 512 (289 NE2d 673); Commonwealth v. Rand, 296 NE2d 200 (Mass. 1973); Barnato v. State, 88 Nev. 508, supra; People v. Palozzi, 74 Misc. 2d 774 (346 NYS2d 595). The Coolidge language spelling out the inadvertence requirement has been quoted in *Lentile v. State,* 136 Ga. App. 611, supra, 614; *Harp v. State,* 136 Ga. App. 897, supra, 899; and *Eagerton v. State,* 134 Ga. App. 637, 641 (215 SE2d 479) (Stolz, J., dissenting). The Georgia Supreme Court applied the test of inadvertence in upholding the plain view seizure of evidence in *Lowe v. State,* 230 Ga. 134, 136 (195 SE2d 919): "Here, as in the Coolidge case, the circumstances are clear in disclosing that the incriminating evidence came into the possession of law enforcement authorities

*inadvertently* and unmotivated by any desire to locate incriminating evidence by any unlawful search and seizure." (Emphasis supplied.) In addition, this court, when approving plain view seizures, has expressly termed the officer's discovery as "inadvertent" in *Caito v. State,* 130 Ga. App. 831 (204 SE2d 765) and *Walker v. State,* 130 Ga. App. 860 (205 SE2d 49). While it is clear that our courts have recognized an inadvertence requirement, it is not at all clear what degree of expectation that evidence will be uncovered negates inadvertence.

Although the cases cited above lay down no abstract principles on the subject, it is apparent from a review of the facts in each case that in none of them did the police have probable cause to believe the particular items of evidence would be uncovered.[3] Other courts have expressly adopted the probable cause standard for inadvertence. "[W]hen law enforcement officers have prior knowledge amounting to probable cause establishing the nexus between the article sought and the place of seizure a warrant must be obtained in order to protect the fourth amendment principle that warrantless seizures are *per se* unreasonable in the absence of exigent circumstances." Lewis v. Cardwell, 476 F2d 467, 470 (6th Cir. 1973). The rationale behind this approach is to ensure

---

[3] Compare, however, the majority opinion in *Eagerton v. State,* supra, which reached the seemingly incongruous result of justifying the seizure on the dual grounds of (1) probable cause to believe drugs would be in the vehicle plus exigent circumstances, all of this prior to detaining it, and (2) plain view of the drugs after detaining the vehicle. If there was probable cause to believe drugs would be in the vehicle, then the plain view doctrine is inapplicable because any discovery of drugs would be intended, not inadvertent. Since the majority held "the state trooper had sufficient probable cause to stop the moving vehicle and search for the suspected illegal drugs" they did not need to reach the issue of whether the seizure after the stop fell within the plain view doctrine.

"that only evidence which the police did not *anticipate* or *know* to be at the locus of a search will be seized without a warrant. When the plain view doctrine is relied upon to justify a warrantless seizure of evidence, attention must be paid also to seeing that the police, in full possession of probable cause to believe that incriminating evidence is present in a particular place have not waited until an opportune moment to 'place themselves in a position to gain a plain view of the evidence.' " Commonwealth v. Walker, 350 NE2d 678, supra, 686. The logic which requires a relatively high degree of expectation —probable cause—before inadvertence will be deemed negated should serve the purposes of the inadvertence requirement (Coolidge, pp. 469-471) without becoming unduly burdensome on legitimate police activities.[4] This requirement should be applied in a way that will "prevent the police from using an entry into a 'constitutionally protected area' . . . for any . . . legitimate purpose—as a mere subterfuge for a 'Plain View' reconnoitering. There may not be a contrived investigatory reconnaissance aimed at evading the warrant requirement for a search or seizure. There may not be a planned 'Plain View.' " Brown v. State, 15 Md. App. 584, supra, 609.

C. Immediate Apparency As Evidence.

The third requirement of the Coolidge plain view doctrine, that the seized item must have been immediately apparent as evidence or as fruit of a crime, has been readily accepted by our courts and needs not be dealt with at length. See *Cook v. State,* 134 Ga. App. 712 (215 SE2d 728); *Caito v. State,* 130 Ga. App. 831, supra; and *Harp v. State,* 136 Ga. App. 897, supra. The cases make it clear that an item is immediately apparent as evidence at the time of seizure if the officer has probable cause to believe that the item is evidence or contraband; he need not know to a certainty the item is evidence. *Campbell v. State,* 226 Ga. 883 (178 SE2d 257); *Boyd v.*

---

[4] A prospective analysis of the problems which could be encountered with different standards of inadvertence is found in Note, "The Supreme Court, 1970 Term," 85 Harv. L. Rev. 3, 244-246 (1971).

*State,* 133 Ga. App. 136 (210 SE2d 251); *Ward v. State,* 137 Ga. App. 462 (224 SE2d 96); *Zimmerman v. State,* 131 Ga. App. 793 (207 SE2d 220).

## II. The Present Case.

In applying the law to the facts of the present case, let us dispose of the easy question first. The Coolidge requirement that the seized item be immediately apparent as evidence is unquestionably met in this case. The items seen compared identically with the description previously given to the officers, and as such they had probable cause at that time to believe that the items were fruits of a crime.

### A. Prior Valid Intrusion?

Under the facts *sub judice,* there are two possible ways the state could validate the seizure. The first route is analogous to the automobile cases discussed above: (1) the visual intrusion was valid; (2) what was then inadvertently seen in open view supplied probable cause to enter and seize the goods; and (3) a legal entry and seizure was then accomplished under an exception to the warrant requirement. Assuming arguendo the first two steps were met, this approach fails simply because the state offered no proof that the entry was under exigent circumstances threatening the removal or destruction of the goods, that the officers were in hot pursuit of a suspect, or that they entered to make an arrest. That leaves the second route: the physical intrusion into the room was valid; the goods then were inadvertently seen in open view and were seized.

The state contends the entry into the room was valid because consensual. The trial judge found that the appellant opened the door from within and later allowed the officers to enter; however, none of this took place until *after* the police had allowed the bellhop to unlock the door with his pass key. Under these facts, the entry was invalid as a matter of law for two distinct reasons.

First, the so-called consent fails to meet the "totality of the circumstances" test of Schneckloth v. Bustamonte, 412 U. S. 218, 227 (93 SC 2041, 36 LE2d 854): "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined

from the totality of all the circumstances." *Jefferson v. State,* 136 Ga. App. 63 (220 SE2d 71); *Flournoy v. State,* 131 Ga. App. 171 (205 SE2d 473). Schneckloth and the other consent cases are dealing with a consent to search and this case involves a consent merely to enter, but when that entry is to be used as the cornerstone for fulfilling an exception to the warrant requirement it must be judged by the same standards. We are required to subject this alleged consent to close judicial scrutiny. *Code v. State,* 234 Ga. 90 (214 SE2d 873).

Was there duress or coercion, express or implied? Consider the scenario. It is early morning, still dark. A man in his hotel room hears knocking at the door but, for whatever reason, does not answer. The knocker identifies himself as a police officer. Then, without explanation, the door is unlocked from the outside. To the occupant, does this chain of events not foretell an intent to enter, no matter what? Do his subsequent acts of opening the door and allowing the officers to enter mean that he consented to their intrusion or that he merely acceded to the inevitable? The Supreme Court has said that consent searches are required to "be free from any aspect of official coercion" (Schneckloth, p. 229), and I believe this requirement was violated. The officers' conduct clearly evidencing an intent to enter even without consent is sufficient to negate, as a matter of law, the efficacy of any subsequent acquiescence.

A different legal analysis of the same facts leads to the same result. The evidence is undisputed that the officers stood by without objection as the bellhop unlocked the door. They were thus permitting, at the minimum, a trespass and an invasion of the appellant's privacy. Under the "fruit of the poisonous tree" analysis of Wong Sun v. United States, 371 U. S. 471 (83 SC 407, 9 LE2d 441), any evidence gained after this initial violation of the appellant's rights is not usable against him unless it can be traced to an independent and lawful source. *Lewis v. State,* 126 Ga. App. 123, supra. The facts do not support a conclusion that the entry was accomplished independently of the initial violation and the taint of that act cannot be said to have been removed by the appellant's subsequent "consent."

For these reasons, there was no valid intrusion prior to sighting the seized evidence.

## B. Inadvertence?

Even if the intrusion into the room had been valid, the seizure still was illegal because the discovery of the items was not, as required, inadvertent. The officers had a fresh report from Arthur Peyton that a described man had been seen minutes earlier removing items from one particular room and taking them to another room. Officer West testified that he had no reason to disbelieve Mr. Peyton, and he answered "yes" to the following question put forth by the defense counsel: "So, then it would be safe to say that you knew pretty well for sure that those articles, unless Arthur Peyton was lying to you, were located in that room, on the other side of that door in Room 419, did you not?" Applying the probable cause standard of Carroll v. United States, 267 U. S. 132, 162, supra, the proper conclusion is, "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief that" the allegedly stolen items would be found in the room. The discovery of the items after the intrusion was not inadvert; any other holding under these facts would ignore the reasoned admonition of Commonwealth v. Walker, 350 NE2d 678, 686, supra, that "[w]hen the plain view doctrine is relied upon to justify a warrantless seizure of evidence, attention must be paid also to seeing that the police, in full possession of probable cause to believe that incriminating evidence is present in a particular place, have not waited until an opportune moment to 'place themselves in a position to gain a plain view of the evidence.' "

In my discussion of the inadvertence requirement, I have advocated the use of the probable cause standard rather than a lesser standard of expectation in order to fulfill the purpose of the requirement—preventing planned "plain views"—without being unreasonably restrictive on legitimate police activities. A lesser standard, "mere expectation," for example, possibly would serve to negate inadvertence in situations where legitimate police investigative activities have turned up

inculpatory evidence. I hesitate to propose any abstract standard at all, lest it be used in isolation from the purpose of the inadvertence requirement, for the real inquiry is whether the plain view was planned in order to sidestep the warrant requirement, or for any other reason.

In the present case, where the officers stood outside the door, knocking and allowing it to be unlocked, waiting for a fortuitous view of the items reportedly stolen and taken to the room, what conclusion is to be reached other than that they were hoping to see and seize the items without going to the trouble of waking a magistrate and obtaining a search warrant? (The trial court concluded, "I think they had probable cause to get a search warrant.") In this case it cannot be said that "[h]ere, as in the Coolidge case, the circumstances are clear in disclosing that the incriminating evidence came into the possession of law enforcement authorities inadvertently and unmotivated by any desire to locate incriminating evidence by any unlawful search and seizure." *Lowe v. State,* 230 Ga. 134, 136, supra. Accordingly, the evidence, for this reason alone, as well as for the previously stated reasons, should have been suppressed.

### III. Conclusion

The majority errs in holding that the plain view doctrine affords legitimation to the seizure. *Brooks v. State,* 129 Ga. App. 393 (199 SE2d 578), relied upon in the majority opinion, is only superficially similar. There, hotel employees summoned police officers after observing suspicious conduct of the defendants including using aliases in their room registrations and keeping pistols in their room. Upon conflicting evidence on the point, the trial judge specifically concluded that the police officers had *not* used a key to unlock the room's door but that it was opened by the defendants after the policeman knocked. When the door was opened the police officers saw in open view a bag of marijuana and they immediately arrested the defendant for possession of a controlled substance. At that time they entered the room and seized an open bag containing stolen coins, and seized the marijuana.

Factually, *Brooks* differs in that the trial court, as trier of fact, found that the door had been opened by the

defendant after a knock, not after a knock and an unlocking.

Legally, *Brooks* differs in that when the door was opened the officers saw the marijuana and *immediately* arrested the defendant. They saw a contraband substance which is easily disposable and they were justified in seizing it as incident to the arrest. The appellant in this case was not immediately arrested, and the items seen in his room were not easily disposable: A suitcase, television, and coat cannot be flushed down a toilet. While there may have been exigent circumstances in *Brooks* requiring immediate seizure, no such exigencies were proved by the state in the present case.

All the probable cause in the world will not authorize a law officer to cross an individual's threshold of privacy; he needs in addition a warrant, or exigent circumstances, or a valid entry to make an arrest, or consent, or some other legal reason. In *Brooks* there was an arrest and there was exigency; in this case there was neither, nor was there consent, nor was there hot pursuit as suggested by the majority. There was not even pursuit. The officers were knocking on the door of a room occupied by a man they had never seen and for all they knew he was not even there. If this is hot pursuit merely because the man had recently been seen carrying allegedly stolen property into the room, then it is difficult to imagine a case where officers with probable cause to search would need a warrant, because they simply could "hotly pursue" the subject into his hiding place.

Furthermore, in *Brooks* there was no evidence indicating to the officers ahead of time that there was marijuana in the room, whereas in this case the officers had a clear picture of the items they were looking for. The discovery of the items in *Brooks* probably was inadvertent; in this case the discovery definitely was advertent.

The United States Supreme Court cases cited by the majority are so inapposite as scarcely to warrant comment. Harris v. United States, 390 U. S. 234, supra, involved the seizure of an inculpatory registration card from an impounded automobile which was being secured pursuant to police department regulations. Frazier v.

Cupp, 394 U. S. 731 (89 SC 1420, 22 LE2d 684), involved a consent search of a duffel bag used jointly by Frazier and his cousin. The seizure of incriminatory items found within was justified even though Frazier was the one who was incriminated and his cousin was the one who gave the consent to search. Finally, Ker v. California, 374 U. S. 23 (83 SC 1623, 10 LE2d 726), involved a search incident to arrest. A brick of marijuana was spotted "in full view" but the sighting was discussed not as a predicate for its seizure but as a predicate for providing the officers with probable cause to arrest Mrs. Ker. The seizure was lawful because it was incident to the arrest. The marijuana "was in the immediate proximity of the Kers at the moment of their arrest so that the seizure was unquestionably lawful under the search-incident law of the time. . ." Coolidge, supra, p. 472, n. 28. Harris, Frazier, and Ker all preceded the Coolidge case, which attempted to clarify the doctrines of those and other previous cases.

In summary, the intrusion preceding the view of the seized items in this case was illegal. The items were not inadvertently discovered. The plain view doctrine as articulated in Coolidge and accepted as the law of this state affords no legitimation to the seizure of these items. It follows that the appellant's arrest and the search of his person incident to that arrest were also invalid. The motion to suppress should have been granted as to the items seized from the appellant's room and from his person. State's counsel has stipulated that admission of the evidence at trial cannot be deemed harmless, so the judgment of conviction should be reversed. I therefore must dissent from the majority's affirmance of the conviction.

I am authorized to state that Presiding Judge Quillian and Judge Webb join in this dissent.