## 55384. KELLEY et al. v. THE STATE.

SMITH, Judge.

The four appellants were arrested for violating the Georgia Controlled Substances Act following the discovery and seizure of a large marijuana crop in rural Hart County. This case is before us on interlocutory appeal from the denial of appellants' motion to suppress the seized evidence. We find that the warrantless search of the appellants' premises cannot be sustained under any valid exception to the warrant requirement, so the trial court is reversed.

I. Evidence at the Suppression Hearing

The primary evidence at the hearing on the motion to suppress was the testimony of Sheriff Sanders, of Hart County. Sanders testified that he first saw two of the appellants, Carlan and Thurman, at an automobile parts

store in Hartwell, about one week prior to the drug seizure. Carlan and Thurman aroused his suspicion, he said, because they were strangers in town and wore long beards and drove a dune buggy; the sheriff resolved to keep an eye on them. At a committal hearing held on July 27, 1977, the sheriff testified that he ran a check on Carlan and Thurman and found that they were not employed in the county. About ten weeks thereafter at the October 6, 1977, suppression hearing, he denied having performed any such investigation.

Although his testimony on this next point was somewhat equivocal and self-contradictory, the sheriff testified generally that sometime before the seizure, possibly the night before, he drove down a dirt road running through an area known as the Rice Mill area. At that time he noticed that a metal gate blocking a road into a fenced pasture was locked, though he had never before known the gate was locked. Also, he noticed what appeared to be dune buggy tracks going up the road.

The date of the drug seizure was June 17, 1977, and it took place in a clearing amid dense woods at the end of the fenced-off road in the Rice Mill vicinity. At the preliminary hearing, defense attorneys intensely probed Sheriff Sanders' reasons for going out to the property on that day, and he added nothing to the above facts. For example, after the sheriff described his discovery of the locked gate and dune buggy tracks, the following exchange transpired: "Q. So because of those circumstances you came back on the 17th? A. Because of the circumstances the day the dune buggy left Anderson Auto Parts. Q. Pardon me? A. The day they left Anderson Auto Parts, they went that direction, too. And, in fact, we had been looking to see where they were staying at. Q. Did you ever have any reason to believe they were committing any crimes or doing anything wrong when you found out about their presence at the place, getting the dune buggy fixed? A. Well, I didn't think they was here growing flowers. Q. Did you have any specific information that they might be growing marijuana? A. No. Q. You were just generally suspicious? A. (Witness nods head affirmatively.) Q. And what were these general suspicions based on at that time? A. What were they based

on? Q. Yes, sir. A. Well, how does anybody hang around all that length of time, say a month, and they were not working or doing anything."

The cross examination probe into the sheriff's reasoning continued a little later at the committal hearing: "Q. What actually caused you to go to that property, Sheriff? A. I was going out there to look to see what was going on. Q. What did you feel was going on out there? A. Just what I found. Q. You felt there might be something wrong going on? A. Yeah."

In the ten weeks which then elapsed before the suppression hearing, the sheriff was able to collect his thoughts and recollect the events leading up to the seizure. On direct examination at the suppression hearing, the sheriff offered but one reason for his field trip to the Rice Mill area: "Q. I call your attention to June 17th. Did you have an occasion to be investigating a case in this area pertaining to possession of marijuana? A. I found it to be marijuana later on. Q. How were you brought into the case? A. I was sitting in my office when we got a telephone call and said I should check the area around what they call the Rice Mill. They didn't say what for. Just said I should check it today." Sheriff Sanders went on to describe the anonymously placed call which related no specific activity but advised him to check the area. He never mentioned this precipitating phone call at the committal hearing. Nor did he mention the bearded men in a dune buggy, the locked gate, or the dune buggy tracks at the suppression hearing until they were coaxed out of him on cross examination.

After receiving the anonymous tip, Sheriff Sanders summoned Deputy Sheriff Vaughn, and together they drove to the Rice Mill area in an unmarked police car. They parked on a different road than the road where the sheriff had previously noticed the locked gate, and from the parked car they walked about three quarters of a mile "around and around in circles" in the densely wooded land. Finally, the sheriff was able to see through the woods into a clearing. Both the woods and the clearing were on flat land. In the clearing, some 100 yards away from the sheriff, the sheriff was able to spot a garden, and in the garden he was able to discern corn plants, bean

plants, and among those vegetables, patches of marijuana plants. He spotted two men walking among the marijuana plants, looking at them, and appearing to talk about them, though they were not harvesting them. And they wouldn't be harvesting the plants, because from 100 yards through the underbrush the sheriff was also able to discern that the plants were too young to be harvested.

He pointed out his find to his deputy, and together they gazed upon the two men, their crop, two large tents, a motorcycle, and a dune buggy, all in the clearing. The two officers neared the clearing and were able to maneuver through the dense woods undetected. As the two men neared the end of one row of the crop, the officers emerged from the undergrowth and inquired as to what they were doing. The officers walked across the field toward the tents and the vehicles, and when they reached the other side of the clearing they advised the men that they were under arrest.

The two men turned out to be brothers named Kelley. A search of the tents in the clearing showed that they were apparently being used as dwellings. Certain items in the tents were identifiable as belonging to Carlan and Thurman, and they, too, were located and arrested. The clearing and large expanses of the surrounding woodlands are owned by a Mrs. Rice, who is a grandmother of the two Kelleys. Carland, Thurman, and both Kelleys are appellants here.

## II. Analysis

A. *Was there an expectation of privacy?* In its brief, the state asserts "that a tent is not characterized at common law as coming within the purview of the type of domesticized structure as to be considered under the Fourth Amendment." We know of no such constraints on the Fourth Amendment's applicability, and the state has cited no authority for the above proposition. Though a tent may not provide the sturdy protection against the winds, the rains, the heat, and the cold, which a customary house provides, the tent-dweller is no less protected from unreasonable government intrusions merely because his dwelling has walls of canvas rather than walls of stone. A dwelling place, whether flimsy or firm, permanent or transient, is its inhabitant's

unquestionable zone of privacy under the Fourth Amendment, for in his dwelling a citizen unquestionably is entitled to a reasonable expectation of privacy. See Katz v. United States, 389 U. S. 347 (88 SC 507, 19 LE2d 576) (1967).

The tents here were legitimate dwelling places; the state has made absolutely no showing otherwise. Our case law has always held that the curtilage of a dwelling is also an area in which the individual has an expectation of privacy, and there can be no question but that the clearing and garden adjacent to these tents was within the curtilage. "The yard immediately surrounding one's dwelling is well within the curtilage." *Black v. State,* 119 Ga. App. 855, 857 (168 SE2d 916) (1969). See also *Wright v. State,* 12 Ga. App. 514 (77 SE 657) (1913), for its exhaustive review of what constitutes the "curtilage." For an analysis of expectations of privacy in open areas, see Gedko v. Heer, 406 FSupp. 609 (W. D. Wis. 1975).

The state suggests two theories under which the officers could justify their warrantless intrusion into the appellants' sphere of privacy: (1) They entered to make a valid warrantless arrest, and the seizure was incident to that arrest; or (2) they had probable cause for a search, and the exigencies required an immediate search and seizure. Under either of these exceptions to the warrant requirements, the state must prove facts supporting the exception, and as to either theory, the state has not met its burden.

B. Was there a valid warrantless arrest, and a search and seizure incident to that arrest? The state contends so, but the proof does not support that contention. First, there is no proof that the visual sighting of the marijuana was not tainted by a trespass on the appellants' property. The evidence does not conclusively show that the officers were not trespassing at the time they first spotted the marijuana. There was some vague testimony about boundary lines, creeks, and fences, and the sheriff testified that he was outside the fence when he spotted the marijuana, although at that moment the deputy was within the fenced area. But we do not need to rest our decision on the possibility of an invalid intrusion prior to the sighting.

At the suppression hearing, not once did the sheriff state that he formed a probable cause determination that a crime was being committed in his presence and that he then moved in and arrested the Kelleys. In fact, his testimony was that he confronted the two Kelleys at the edge of the clearing, asked, "What you boys doing here?," walked across the field to where the tents stood, *then* placed the Kelleys under arrest. The only suggestion in the evidence is that this decision to arrest was formed *after* the intrusion into the clearing, *after* the walk across it, and, thus, *after* a search of the area. That search cannot be said to be incident to the arrest.

C. Was there probable cause to search, plus an exigency requiring an immediate seizure without delaying to obtain a warrant? Again, the state contends so, but we cannot agree that there was both probable cause and exigency.

(1) Probable Cause. There clearly could not have been probable cause prior to the time the sheriff claims to have spotted the marijuana plants. He testified that until that time he was operating only on conjecture, vague conjecture at that. And, as stated above, the state did not refute the possibility that the officers had already intruded into the appellants' privacy when they made the sighting.

Laying the above problems aside, we do have the sheriff's testimony that he spotted marijuana plants from over 100 yards away and moved in to seize them. Photographs in the record show the clearing with immature marijuana plants growing among corn and other vegetables. The corn appears to be three to four feet high, while the marijuana looks scarcely taller than two feet. The clearing is surrounded by dense woodland. It is wholly contrary to human experience to expect both (1) that the officers rambled several hundred yards in a dense woodland, crossing streams and fences, without ever trespassing onto the appellants' premises; and (2) that they were able to discern with certainty the growing marijuana plants from so great a distance. To the contrary, it is consistent to expect that they happened directly onto the clearing, walked across it surveying the foliage, and then and there formed their "probable cause"

to search and seize.

(2) Exigent circumstances. Even if there was probable cause, there was *no evidence whatsoever* showing that there was any exigency requiring an immediate search. The sheriff stated that he and the deputy had not been detected at the time they saw the marijuana. The marijuana was not being harvested, and he did not believe that its harvest or destruction was imminent. A two-way radio was in the unmarked car parked nearby, from which the sheriff called for assistance in destroying the plants; the radio would have been equally useful for relaying information which another officer could use to obtain a warrant. Sheriff Sanders never testified that he sensed any urgency at all; his perception of the situation is perhaps best illustrated by his statement at the committal hearing in response to inquiries why he did not obtain a warrant after spotting the marijuana: "I knowed myself, anything I see in my own visible eyes I can confiscate." He can confiscate plainly viewed contraband if he does not have to cross a threshold of privacy to do so. *Lewis v. State,* 126 Ga. App. 123 (190 SE2d 123) (1972); *Hatcher v. State,* 141 Ga. App. 756, 764 (234 SE2d 388) (Judge Smith dissenting). But if the sheriff was outside the premises when he spotted the marijuana, he needed a warrant or exigency to enter; if he was already inside the threshold of privacy, then his probable cause was illegally obtained. Either way, the search and seizure was not lawful.

## III. Conclusion

The area occupied by the appellants was a protected zone of privacy, where the appellants were to be free from unreasonable intrusions by the state. The record shows that the officers did not enter the zone of privacy to make an arrest; hence, the search and seizure cannot be justified as incident to an arrest. This factually distinguishes the case from *Patterson v. State,* 133 Ga. App. 742 (212 SE2d 858) (1975). And even if the officers stood outside the zone of privacy and developed probable cause to search based on their observations, the state has not met its burden of proving any exception to the requirement that the officers obtain a warrant before crossing the threshold of privacy. We must conclude that the motion to suppress should

have been granted.

*Judgment reversed. Deen, P. J., and Banke, J., concur.*

ARGUED MARCH 1, 1978 —
DECIDED JUNE 12, 1978.

*William O. Carter, James K. Jenkins,* for appellants.
*J. Cleve Miller, District Attorney, Lindsay A. Tise, Jr., Assistant District Attorney,* for appellee.