*24 BECK, Judge:
The issue in this appeal is whether under the fourth amendment a defendant has a reasonable expectation of privacy in an uninhabitable structure which appellant was using to engage in the sale of narcotics. We conclude that appellant had no constitutionally-protected expectations of privacy in the premises searched and as such the police entry did not infringe on fourth amendment rights. Alternatively, we find that exigent circumstances existed which compelled the police to effect a warrantless entry. Therefore, the trial court correctly denied the appellant’s motion to suppress. We affirm the judgment of sentence.
The facts underlying the instant appeal are as follows. On the evening of December 14, 1987, Officer Steven Powell, acting on an anonymous tip, went to 2001 West Turner Street in Philadelphia. Powell had been informed that crack and powdered cocaine were being sold through a hole in the door at this location. When the police officer arrived he observed a heavily secured structure which previously had been a storefront but clearly was no longer being used for such purposes. The front windows of the structure were covered with heavy metal gratings and there was a three inch hole in the wooden front door where a doorknob might normally be located. Based on his experience, coupled with the information from the anonymous tip, the officer concluded that the structure was the site of a narcotics selling operation known as a “gate house.” A gate house is characterized by the following features: a heavily fortified location; a juvenile or young person manning the sales from inside; quick turnover and sales; and no personal or visual contact between buyer and seller (i.e., the money goes into the hole in the door and the drugs come out).
Satisfied that he had identified the location which was the subject of the tip, Officer Powell knocked on the door. A voice from inside asked, “What do you want?” Powell answered that he wanted “one dime,” meaning an amount of cocaine he could purchase for ten dollars. Powell put a *25 ten-dollar bill through the hole in the door and received the drugs. The bill had been pre-recorded and treated with a perspiration reactive powder which stained whoever handled it with an indelible bright blue dye. The dye allows police later to identify the person who had handled the money despite the lack of visual identification. Realizing that the blue dye becomes dramatically visible almost immediately, Powell and his fellow officers attempted to enter the structure to arrest the drug seller. The police knocked on the door and identified themselves. The officers heard “thumping and rustling” noises coming from within the structure but received no answer. The door was secured by heavy bolts and was braced from the inside by several large pieces of wood. The only way the police could open it was by finding a weak point and literally breaking the door in half. When the police entered they found “an unoccupied or abandoned type of property,” which appeared to be “an old storefront” but which, as the officer testified, contained “no inventory in there, or anything else that would make it a store.” On a sofa just inside the door was a bag containing packets and vials of cocaine in powdered and crack form. In a back room adjacent to the storefront, the police found appellant. He had blue dye all over his hands and on his pants pocket. The ten dollar bill used by Powell to buy the cocaine was in the pocket. Appellant had been in bed with a woman who likewise had blue dye on her body.
The officer described the area in which he found appellant as “disgusting.” There were no toilet facilities and there was a five-gallon bucket containing human waste. The officer was reluctant even to describe the place appellant was found as a “bed” since it was makeshift at best. There was no indication that appellant or anyone was occupying the storefront for any purpose other than to disguise and conduct illegal drug, activity. In fact, the record indicates that the premises were wholly unsuitable for habitation and were not being used as any kind of residence.[1] When *26 appellant was asked for his address following arrest, he gave it as 1303 S. Dorrance Street in Philadelphia, and not the building in which he was found.
Appellant sought to suppress the evidence seized following the officers’ warrantless entry into the structure. Following a hearing, Judge Jane C. Greenspan found that “the abandoned storefront was not arguably a home in the sense intended to be protected by the Fourth Amendment. Having no indicia of a home, it can fairly be said that defendant (not even a resident) had no reasonable or legitimate expectation of privacy in the premises.” Judge Greenspan further found that exigent circumstances justified the warrant-less entry. We agree with the conclusions of the trial court.
The fourth amendment guarantees “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.” Our courts consistently have held that the application of the fourth amendment depends upon whether the person invoking its protection has a “justifiable,” “legitimate” expectation of privacy that has been invaded by government action. See, e.g., Commonwealth v. Oglialoro, 525 Pa. 250, 256, 579 A.2d 1288, 1291 (1990)(“The controlling consideration is whether the individual contesting the search and seizure entertains a legitimate expectation of privacy in the premises or area searched.”); see also Commonwealth v. Brundidge, 404 Pa.Super. 106, 113, 590 A.2d 302, 305-306 (1991); Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); Rakas v. Illinois, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). The individual’s actual or subjective expectation of privacy alone does not control whether constitutional protection will be extended. See, e.g., Hudson v. Palmer, 468 U.S. 517, 525-526 n. 7,104 S.Ct. 3194, 3199 n. 7, 82 L.Ed.2d 393 (1984); Common *27 wealth v. Copenhefer, 526 Pa. 555, 561, 587 A.2d 1353, 1356 (1991). As Mr. Justice Powell noted in his concurring opinion in Rakas, “it is not enough that an individual desired or anticipated that he would be free from governmental intrusion.” Rakas v. Illinois, 439 U.S. at 151-152, 99 S.Ct. at 434-35 (Powell, J., concurring). The test of legitimacy is not, and could not be, whether the individual hopes to conceal his activity. See Commonwealth v. Copenhefer, 526 Pa. at 561, 587 A.2d at 1356 (“A defendant’s attempt to secrete evidence of a crime is not synonymous with a legally cognizable expectation of privacy.”); see also Oliver v. United States, 466 U.S. 170, 182-183, 104 S.Ct. 1735, 1743, 80 L.Ed.2d 214 (1984). In order to claim fourth amendment protection, an individual’s expectation of privacy must be one that society is prepared to recognize as reasonable. See Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (Harlan, J., concurring). The resolution of this issue depends upon the totality of the circumstances and ultimately rests upon a balancing of the societal interests involved. Hudson v. Palmer, 468 U.S. at 527, 104 S.Ct. at 3200; Rawlings v. Kentucky, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).
In support of his argument that he had a “reasonable expectation of privacy” in the area searched, appellant points to several factors all of which, in our view, establish nothing more than appellant’s subjective interest in concealing and keeping “private” his own conduct. Specifically, appellant notes that the use of a heavily fortified door and the fact that he chose to engage in intimate, sexual activity on the premises illustrate his expectation that “this area would remain private.” This approach is untenable and has been uniformly rejected by our courts. As Mr. Justice Rehnquist (now Chief Justice) stated in Rakas v. Illinois:
Obviously ... a “legitimate” expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thor *28 oughly justified subjective expectation of privacy, but it is not one which the law recognizes as “legitimate.” His presence, in the words of Jones [citation omitted] is “wrongful;” his expectation is not “one that society is prepared to recognize as ‘reasonable.’ ”
Id. 439 U.S. at 143 n. 12, 99 S.Ct. at 430 n. 12 [citations omitted].
Likewise, the United States Supreme Court, in Oliver v. United States, supra, concluded that legitimate expectations of privacy could not be created simply by building fences and posting “no trespassing” signs around secluded land used to cultivate marijuana. The Court noted: “Certainly the Framers did not intend that the Fourth Amendment should shelter criminal activity wherever persons with criminal intent choose to erect barriers and post ‘No Trespassing’ signs.” 466 U.S. at 182 n. 13, 104 S.Ct. at 1743 n. 13.
The fortification of the door in the instant case no more legitimized appellant’s expectations of privacy than did the erecting of fences and posting of signs in the Oliver case. We are persuaded that appellant actually desired that his activities within the gate house remain private and free from government intrusion. However, in our view it would trivialize the fourth amendment to base its protection on the number and strength of the barricades an individual erects to shield his activities from official detection. The “legitimacy” element of the inquiry must have more content than appellant suggests.[2]
*29 Of course, it is now beyond dispute that fourth amendment protection is not limited to private homes or “other specifically designated locales.” United States v. Chadwick, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977). Relying on the oft-repeated but over simplified principle that the fourth amendment “protects people, not places”,[3] the Supreme Court frequently has repudiated the notion that the scope of the constitutional protection can be defined solely by the kind of property involved in the search. On the other hand, “people” are not protected wherever or whenever they assert any privacy interest. People can claim fourth amendment protection only insofar as they can assert a reasonable and legitimate expectation of privacy in a particular physical space.[4]
*30 Several factors are relevant in assessing whether an individual legitimately may claim the protection of the fourth amendment. Courts will look to the intended reach of the fourth amendment, the nature of the structure or area searched and the uses to which the structure or area is put, and societal judgments and understandings regarding the privacy rights asserted. In order to assess the legitimacy of an asserted expectation of privacy we seek to uncover “our societal understanding” of which areas and what conduct should be accorded this “scrupulous protection.” Oliver v. United States, supra, 466 U.S. at 178, 104 S.Ct. at 1741 (emphasis in original).
Foremost, of course, among the areas for which “scrupulous protection” is provided against government intrusion by the fourth amendment is an individual’s home.[5] Traditional and inviolate expectations of privacy in one’s home are the bedrock of constitutional protection against arbitrary government intrusion.[6] This protection does not stem from notions of common law property interests in the premises. Nor does the protection surrounding the home depend upon whether the dwelling comports with conventional notions of the definition of a home or how a home is constructed. Further, the word “houses” has never been taken literally by our courts. Fourth amendment protection is not grudgingly extended only to those premises which can be characterized as the permanent living quarters of *31 the occupants who claim constitutional shelter therein. Therefore, legitimate expectations of privacy are found in hotel rooms during a period of paid occupancy.[7] Commonwealth v. Cooper, 240 Pa.Super. 477, 488, 362 A.2d 1041, 1049, vacated on other grounds, 468 Pa. 390, 363 A.2d 783 (1976), cert. denied, 429 U.S. 1048, 97 S.Ct. 758, 50 L.Ed.2d 763 (1977). Likewise, fourth amendment protection extends to offices and commercial premises.[8]
Finally, the Supreme Court recently held that an overnight houseguest can claim a legitimate expectation of privacy in his host’s home. Minnesota v. Olson, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).[9] In so holding, the Supreme Court “merely recognize[d] the everyday expectations of privacy that we all share.” Id. at-, 110 S.Ct. at 1689, 109 L.Ed.2d at 94. The Court reasoned:
Staying overnight in another’s home is a longstanding social custom that serves functions recognized as valuable by society. We stay in each others’ homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. We will all be hosts and we will all be guests many times in our lives. From either perspective, we think that society recognizes that a houseguest has a legitimate expectation of privacy in his host’s home.

Id.

Implicit in the above discussion is a common, deep and basic understanding that our society accords to its citizens *32 the right to be secure in areas and activities ordinarily associated with autonomy, privacy and lifestyle. Society assumes that certain areas and certain activities must be safeguarded because our traditions and common experience teach us that without that protection our freedom and security would be intolerably undermined. Society is willing, indeed anxious, to legitimize expectations of privacy because we all share the fundamental understanding that safe and inviolate zones of privacy are necessary to live our lives and conduct our business.[10]
Against the backdrop of these principles, we assess appellant’s claim to a legitimate expectation of privacy in 2001 West Turner Street. Appellant blandly asserts that there was a couch in one room and a bed in another and that a “home has the highest expectation of privacy.” We consider appellant’s cynical claim for constitutional protection of his “home” wholly unsupportable.[11] As our previous discussion makes plain, it is not the superficial characteristics of a structure, its walls, windows, doors or even furnishings, which give it the constitutional cloak accorded a home.[12] Rather, it is the habitation of the structure and its *33 use as a residence which form the purpose of the constitutional protection. Appellant’s reliance on the existence of a random piece of furniture or a heavily barricaded door misses the point. Noone inhabited the area into which the police entered. In fact, the evidence at the hearing established that it was uninhabitable as a dwelling and was wholly unsuited to domestic use.[13] The record supports the conclusion that the structure was a vacant storefront with no indicia of home life whatsoever. We think that it is of no consequence that appellant and his female friend chose to engage in sexual activity in an adjacent room. A sexual encounter does not transform this structure into an area in which appellant could have had a legitimate expectation of privacy.
Moreover, appellant’s only relationship to the structure in question was as a temporary drug dispersal depot. The facts developed at the hearing demonstrated that the storefront was a typical “gate house” operation which is constructed solely for rapid and highly protected drug distribution. The structure clearly was an abandoned building, *34 previously owned and operated as a store.[14] From the record we can conclude that 2001 West Turner was an example of urban wreckage which appellant and his cohorts conveniently transformed into temporary headquarters for their drug trade. The premises were outfitted with nothing more than was necessary to conduct the narcotics sales and avoid official detection. Appellant claimed no other relationship to the structure nor did the record suggest one.[15] Appellant was not legitimately on the premises. Nothing in the record could support the inference that appellant had any right to enter or use the building. Under these circumstances, we conclude that society would not be prepared to recognize appellant’s expectation of privacy as a legitimate one.[16]
This court reached the same conclusion in a similar case, Commonwealth v. Cameron, 385 Pa.Super. 492, 561 A.2d 783 (1989), appeal denied, 525 Pa. 576, 575 A.2d 108 (1990). In Cameron, the defendant was arrested for selling narcot *35 ics inside a building with characteristics resembling the one in the instant case. The building in Cameron was littered with trash, windows were boarded up or broken, there were no bathroom facilities and no running water or electricity. When the defendant in Cameron was arrested, he gave another address as his residence. The suppression court granted Cameron’s motion to suppress the seized narcotics, reasoning that the presence of food, a couch, and a television set gave the building some attributes of a dwelling. This court reversed. We found that the record revealed that Cameron had no “legal or de facto right to control the house.” Cameron, 385 Pa.Super. at 498, 561 A.2d at 786. We found that the house was “not a home, but a mere structure” which was both abandoned and uninhabitable. The Cameron court held that “under the facts of this case, a television, a couch, and a platter of food are insufficient attributes of a home, and so failed to call the protection against unreasonable searches and seizures into play.” Id., 385 Pa.Superior Ct. at 499-501, 561 A.2d at 787-788. The court concluded that “under the Pennsylvania Constitution, as well as under the Constitution of the United States, it is unreasonable to expect that one has a privacy interest in an abandoned structure which is not one’s dwelling place.” Id., 385 Pa.Superior Ct. at 498-499, 561 A.2d at 786-787. We find nothing to distinguish this case from Cameron. Appellant likewise can claim no cognizable constitutional violation.
Moreover, we agree with the trial court that exigent circumstances existed which justified immediate warrant-less entry into the premises. Even if the premises here had been appellant’s “home” sufficient to establish a legitimate expectation of privacy, the necessity to obtain a search warrant was obviated by the exigent circumstances confronting the police.
It is well-settled that exigent circumstances excusing the warrant requirement arise where the need for prompt police action is imperative. See Commonwealth v. Maxwell, 505 Pa. 152, 477 A.2d 1309 (1984); Commonwealth v. Ehrsam, 355 Pa.Super. 40, 512 A.2d 1199 (1986), *36 appeal denied, 515 Pa. 573, 527 A.2d 535 (1987), cert, denied, Ehrsam v. Pennsylvania, 493 U.S. 932, 110 S.Ct. 321, 107 L.Ed.3d 311 (1989). Exigent circumstances can be generated when evidence sought to be preserved is likely to be destroyed or secreted from investigation, or because the officer must protect himself from danger to his person by checking for concealed weapons. Commonwealth v. Holzer, 480 Pa. 93, 102, 389 A.2d 101, 106 (1978). Whether exigent circumstances exist depends on “an examination of all of the surrounding circumstances in a particular case,____ These circumstances will vary from case to case and the inherent necessities of the situation at the time must be scrutinized.” Commonwealth v. Hinkson, 315 Pa.Super. 23, 27, 461 A.2d 616, 618 (1983). Here, the trial court found that the factors facing the police supported invoking the exigent circumstances exception to the warrant requirement. We agree.
The police had ample probable cause to believe that narcotics were being distributed from the premises of 2001 West Turner Street. Their belief was supported by the informant’s tip, their knowledge of the typical “gate house” operation, and, of course most crucially, by the recent purchase of cocaine by Officer Powell through the hole in the barricaded front door. The police knew that the evidence and the narcotics trafficker were on the premises at the time of the buy but that moments after the seller had handled the money, his hands would be stained with a telltale, vibrant blue dye. Clearly, the discovery of the dye would alert the seller to the police presence, causing him to destroy the evidence and/or flee the premises. The use of the dye made prompt police action imperative. Packets and vials of cocaine are easily hidden or destroyed and it is reasonable to infer that had the occupants of the gate house become aware of the dye, the evidence necessary for conviction would immediately have been lost. In fact, even absent the blue dye investigative technique, the modus operandi of the “gate house” operation made it unlikely that, had the police left to obtain a warrant, any remnants of the opera *37 tion would have remained upon their return.[17] Moreover, as soon as the police knocked and announced themselves, they heard noises inside the structure which convinced them that immediate entry was necessary to avoid destruction of evidence and escape.
We emphatically reject appellant’s suggestion that the police deliberately created the exigencies here in order to circumvent the fourth amendment.[18] The general principle, cited to us by appellant, that the police “cannot deliberately create exigent circumstances in order to subvert the warrant requirements of the Fourth Amendment,” [19] is undoubtedly a sound concept but it is inapplicable here. The issue is not whether some action undertaken by the police in the performance of their duties contributed to the circumstances which created the exigencies justifying a warrant-less entry. Rather, the inquiry is whether the police manufactured the exigency in a deliberate attempt to avoid the warrant requirement. The reasonableness of the police conduct depends upon the totality of the circumstances, not the least of which is “the nature of the investigation of which the warrantless activity is a part.” See United *38 States v. Webster, supra note 19, 750 F.2d at 327-328. If the police used a reasonable and legitimate technique which was employed for independent investigative purposes, apart from a desire to “invent” exigent circumstances, the police actions will not invalidate the warrantless entry. See United States v. Socey, 846 F.2d 1439, 1448-1449 (D.C.Cir.), cert. denied, 488 U.S. 858, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988) (“the police should not be taxed with having failed to cover every eventuality____ As long as police measures are not deliberately designed to invent exigent circumstance, we will not second-guess their effectiveness”).[20]
In the instant case, we agree with the trial court that “[i]t was the defendant’s manner of conducting his drug sale business that created the exigency.” The trial court stressed that the investigative technique employed by the police here, i.e., the use of the pre-recorded dyed money, resulted from appellant’s sale of the narcotics through a impregnable, opaque barrier. The tactic was designed to frustrate police ability to identify anyone inside the “gate house.” The use of the dye to verify the identity of the drug trafficker was a reasonable, indeed arguably necessary, investigative tool. It served an independent and legitimate purpose as part of an ongoing investigation, the nature of which was dictated primarily by appellant’s narcotics distribution scheme. There is no support for appellant’s suggestion that the police unnecessarily created the exigency deliberately to by-pass the warrant requirement. We decline to relegate the police to investigative methods which would afford criminals greater success in evading *39 justice. We conclude that there was nothing unreasonable in the police action at issue here.
Judgment of sentence affirmed.
POPOVICH, J. files a dissenting opinion.
HOFFMAN, J. files a concurring opinion.

. One or two rooms on the upper floors of the building contained "boarders" who were discovered by police. They did not appear to *26 have any active role in the gate-house narcotics operation. (See note 13, infra.) In response to Judge Popovich’s dissent, we point out that the polices’ knowledge of the condition of the structure is not the proper focus in analyzing the fourth amendment issue. The proper focus is the defendant’s legitimate expectation of privacy.

. We fail to understand appellant’s reliance on Commonwealth v. Sell, 504 Pa. 46, 470 A.2d 457 (1983) and the concurring opinion’s suggestion that Sell dictates a different constitutional analysis from that which we have herein undertaken. In Sell the supreme court retained Pennsylvania's “automatic standing” rule which permits those charged with a possessory offense to assert a suppression claim and challenge the legitimacy of the governmental action. Sell did not, in itself, nor in subsequent application purport to resolve the merits of the constitutional claim raised. As Judge Hoffman notes in his concurrence, Sell admonishes us as a reviewing court to focus on "the need for protection from illegal governmental conduct offensive to the right of privacy”. Sell, 504 Pa. at 65, 470 A.2d at 468. However, whatever misgivings the Sell court initially intimated regarding the adoption of *29 the defendant’s "legitimate expectation of privacy” as the touchstone of constitutional protection against governmental intrusion, it is now clear that the courts of this Commonwealth have consistently embraced and applied this standard. In fact, in Commonwealth v. Ogtialoro, supra, 525 Pa. at 254-256, 579 A.2d at 1290-1291, a possession of marijuana case in which the defendant presumably had “automatic standing”, the supreme court stated:
To prevail successfully on a claim of governmental invasion of privacy, [this defendant] is required first to show that a subjective expectation of privacy exists as to the area being searched. An expectation of privacy is present when the individual, by his conduct, "exhibits an actual (subjective) expectation of privacy" and that the subjective expectation “is one that society is prepared to recognize as “reasonable."
(citations omitted).
This is precisely the analysis employed here to determine whether the governmental action offended a protected zone of privacy. After Ogtialoro, supra; Commonwealth v. Blystone, 519 Pa. 450, 456, 549 A.2d 81, 87 (1988); Commonwealth v. Brundidge, supra; Commonwealth v. Ferretti, 395 Pa.Super. 629, 577 A.2d 1375, appeal denied, 589 A.2d 688 (1991); Commonwealth v. Cameron, 385 Pa.Super. 492, 561 A.2d 783, (1989) appeal denied, 525 Pa. 576, 575 A.2d 108 (1990); Commonwealth v. Kean, 382 Pa.Super. 587, 556 A.2d 374 (1989), it is clear in Pennsylvania that the focus of the inquiry for search and seizure challenges is the defendant’s legitimate expectation of privacy.

. Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967).

. We realize that reasonable expectations of privacy certainly extend to activities and conduct which can be characterized as non-spatial or non-physical. Intrusions into zones of privacy surrounding personal and professional communications often implicate fourth amendment issues and do not involve expectations of privacy in a physical place *30 or material effect. Government intrusions into these areas frequently involve sophisticated techniques of electronic surveillance and can often conjure up alarming, Orwellian invasions of privacy. Nevertheless, these cases, as well as the instant case, are subject to the same constitutional analysis, i.e., can the person invoking protection claim a legitimate expectation of privacy against government action?

. The "sanctity of a man’s home and the privacies of life" form the core of constitutional concern. Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886).

. “Certainly the safeguarding of the home does not follow merely from the sanctity of property rights. The home derives its preeminence as the seat of family life. And the integrity of that life is something so fundamental that it has been found to draw to its protection the principles of more than one explicitly granted Constitutional right.” Poe v. Ullman, 367 U.S. 497, 551-552, 81 S.Ct. 1752, 1781, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting).

. Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964).

. Marshall v. Barlow’s Inc., 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).

. This court recently held that an individual who appeared to be no more than a casual visitor in a friend’s apartment had no reasonable expectation of privacy therein. Commonwealth v. Ferretti, supra, 395 Pa.Super. at 639, 577 A.2d at 1381 (1990). Accord, United States v. McNeat, 735 F.Supp. 738 (N.D.Ohio 1990) (holding that Minnesota v. Olson is limited to overnight guests and should not be extended to someone who is nothing more than a casual visitor who is there to use the phone).

. "Expectations, of privacy are established by general social norms.” Robbins v. California, 453 U.S. 420, 428, 101 S.Ct. 2841, 2847, 69 L.Ed.2d 744 (1981) (plurality opinion), overruled on other grounds, United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

. In our view, it would demean and offend the "sanctity of the home” to find that an individual has a legitimate expectation of privacy in this structure. The record is unassailed that the sole use of the premises here was as a narcotics trading post. We query, as did Justice Papadakos in his Concurring Opinion in Support of Affirmance in Commonwealth v. Lopez, 525 Pa. 185, 191, 579 A.2d 854, 857 (1990):
Do we really mean to protect those "homes" which are nothing more than warehouses for the storage of drugs which are to be illegally sold, or for storerooms in which these drugs are illegally sold, or kitchens in which these drugs are cooked and manufactured for illegal sale____ What is the nature of this "home” we so desperately seek to protect from the intrusion of governmental stormtroopers?
(emphasis supplied).

. The Georgia Court of Appeals characterized the fourth amendment protection given to a tent in which the defendant lived as follows:
*33 Though a tent may not provide the sturdy protection against the winds, the rains, the heat, and the cold, which a customary house provides, the tent-dweller is no less protected from unreasonable government intrusions merely because his dwelling has walls of canvas rather than walls of stone. A dwelling place, whether flimsy or firm, permanent or transient, is its inhabitant’s unquestionable zone of privacy under the fourth amendment, for in his dwelling a citizen unquestionably is entitled to a reasonable expectation of privacy.
Kelley v. State, 146 Ga.App. 179, 245 S.E.2d 872, 874-875 (1978).
Just as the canvas walls in Kelley did not rob the tent of constitutional protection, so the barricades and fortifications here do not alone supply fourth amendment coverage to a structure which cannot in any way be described as appellant’s home.

. The fact that there were a couple of "boarders” occupying one or two rooms in the upper part of the building is not determinative of appellant’s legitimate expectations of privacy in the barricaded storefront. There was no evidence to suggest that appellant himself boarded in the building; in fact he indicated to police that he resided elsewhere. Moreover, there was noone living in the vacant storefront itself where the warrantless entry took place.

. We use the word "abandoned” in a descriptive sense to point out that the prior legitimate use of the premises had been abandoned and the structure remained vacant. We do not use "abandoned” in the sense often used in search and seizure cases to conclude that an individual who has abandoned particular property no longer can claim a legitimate expectation of privacy therein. See, e.g., Commonwealth v. Cihylik, 337 Pa.Super. 221, 486 A.2d 987 (1985).

. We do not imply that the criminal nature of the activity performed in the structure controls whether fourth amendment protection should apply. Had appellant been dispersing drugs out of his bedroom in his home clearly he would have been able to claim a legitimate expectation of privacy. Plainly, his conduct would be no less violative of the law but society could not sanction police entry into his home absent a warrant or exigent circumstances. On the other hand, as this opinion makes clear, appellant cannot claim a legitimate expectation of privacy based solely on his use of this structure as a way-station for the dispersal of drugs. The presence of illegal activity coupled with appellant’s obvious subjective intent to shelter his conduct from official view do not together create a legitimate expectation of privacy.

. Although uttered in another context, we agree with Judge Kelly’s observation that "[the protection against unreasonable search and seizure] was intended to prevent oppression, and not to assist criminals in efforts to erect barriers to the discovery of truth.” Commonwealth v. Schaeffer, 370 Pa.Super. 179, 256, 536 A.2d 354, 393 (1987) (Kelly, J., concurring and dissenting).

. Suppression hearing testimony was that a "very fast turnover" typifies gate-house operations. Therefore, according to the officers, given the time it takes to secure a warrant, chances were "pretty slim" that the sellers would still be on the premises when the police returned. Moreover, the police testified that effective surveillance of the building while a warrant was being secured was impossible. The police had no idea where possible routes of exit were located and any attempt to find them would, according to the testimony, have alerted the occupants to their presence. Destruction of evidence surely would have followed.

. See State v. Hutchins, 116 N.J. 457, 457, 561 A.2d 1142, 1144 (1989), in which the New Jersey Supreme Court surveys the current law on exigent circumstances, including so-called "police-created exigencies." In Hutchins, the court concludes, “[even where] the exigent circumstance can properly be described as ‘police-created,’ it may have arisen as a result of reasonable police investigative conduct intended to generate evidence of criminal activity. In that context, the exigency of potential destruction of narcotics, if accompanied by probable cause, could support a warrantless entry into the premises.” We think this language accurately describes what occurred in the instant case.

. United States v. Webster, 750 F.2d 307, 327 (5th Cir.1984), cert. denied, 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985).

. A panel of this court recently addressed the issue of police-created exigencies in Commonwealth v. Ariondo, 397 Pa.Super. 364, 580 A.2d 341 (1990). In our view, the facts in Ariondo bear no resemblance to the instant case. The exigency created by the police in Ariondo (i.e., the inexplicable removal of the vast bulk of cocaine being delivered to the defendant, leaving only a fraction of the delivery in the package) appeared to serve no independent, legitimate investigative purpose unrelated to the warrant requirement. By contrast, the trial court here found that the use of the blue dye was reasonable, necessary and, most importantly, inspired by the nature of the defendant's criminal enterprise. Therefore, Ariondo is wholly inapposite.