OPINION OF THE COURT
Richard C. Wesley, J.
INTRODUCTION
Defendant William Anthony Herner is charged under indictment No. 960/91 with two counts of murder in the second degree; one count of assault in the first degree; two counts of robbery in the first degree; one count of criminal trespass in the third degree; and one count of menacing. Defendant has moved for suppression of tangible property, of statements, and of identifications. Pursuant to a June 10, 1992 decision and order of this court, suppression hearings were held August 27-28 and December 17, 1992. For the reasons set forth below, defendant’s motions to suppress are denied, except as to the last page of his statement concerning the Stewart Street shootings.
FACTS
On November 3, 1991, Rochester Police Department (RPD) Detective Casper J. Caceci interviewed a clerk who was on duty at Sal’s Birdland Restaurant when it was robbed on October 26, 1991. From a photo array, the clerk identified *737 defendant as the robber, and gave a sworn statement to that effect. Detective Caceci conveyed the information to then-Lieutenant Robert Goldfinger, the staff duty officer on November 3rd.
The same day, RPD Investigator Terrance Sheridan became aware of the information developed by Detective Caceci. He obtained defendant’s last known address from RPD’s Edicon automated video identification system. Investigator Sheridan went to that address, 267 Elmdorf Avenue, that afternoon, and spoke to defendant’s mother Helen Hannah. She told Sheridan that defendant did not reside there, but that he "sneaks into her garage from time to time * * * without her permission”. That evening, Sheridan telephoned RPD Sergeant John Prewasnicak, the supervisor on duty on the midnight shift of the Genesee Section (which included Elmdorf Avenue). Sheridan told Prewasnicak that they were looking for a subject wanted in an armed robbery, and that they had information that the subject on occasion hid out in his parents’ garage at 267 Elmdorf Avenue.
Sergeant Prewasnicak testified that at about 6:20 a.m. the next day, he participated in the arrest of defendant. He recalled Investigator Sheridan having told him on the telephone that defendant was wanted for a robbery, "and that he probably would be in the garage at 267 Elmdorf Avenue”. The officers proceeded directly to the garage without stopping at the house. The door of the garage was closed; the window on the right side of the garage was boarded up. Sergeant Prewasnicak and Officer Cedric Felton proceeded to the rear of the garage, which had a window frame from which (they testified) the entire window had been removed. The police officers used their flashlights to look inside and saw a man lying on a couch. The officers testified that, other than the couch, there was no furniture inside the garage, only bicycles, tools, and other "clutter” that one would expect to find in a garage.
Sergeant Prewasnicak indicated that the man on the couch was waking up and looked at him. Sergeant Prewasnicak inquired, "William?”; defendant responded, "Yeah.” Sergeant Prewasnicak told defendant that he was under arrest for robbery. He went into the garage through the window frame with his gun drawn. Defendant was allowed to put on his clothes, and was handcuffed. Sergeant Prewasnicak had defendant show him where the lock was on the garage door. The Sergeant raised the door. Officer Felton escorted defendant to Officer Felton’s vehicle.
*738 After Officer Felton transported defendant to the Public Safety Building, Sergeant Prewasnicak allowed defendant to use the bathroom. Thereafter, the Sergeant left defendant handcuffed to a table in an interview room, at approximately 6:40 a.m. Defendant did not appear to be intoxicated or under the influence of drugs. Neither Sergeant Prewasnicak nor anyone else in his presence ever threatened defendant or made promises to him. Defendant never requested a lawyer or indicated that he did not want to talk to the police. The testimony of Officer Felton and Officer Ronald L. Bryant concerning the arrest and transportation of defendant and defendant’s condition was consistent with Sergeant Prewasnicak’s testimony.
RPD Investigator Terrance W. Coleman testified that he entered the defendant’s interview room about 8:05 a.m. that day. He introduced himself and his partner Detective Gordon Hall, and told defendant that they "were there to investigate and talk to him about an incident that occurred where two people were killed and one person was shot and wounded and to discuss with him several other robberies that he had been implicated in by a Mr. Brian Morton”. He then advised defendant of his constitutional rights. Defendant indicated he understood them, and agreed to waive his rights and talk to them. From 8:10 a.m. to 9:20 A.M., Coleman and his partner talked to defendant regarding information they had obtained from Mr. Morton implicating defendant in several robberies in the Rochester area.
Although defendant initially denied participating in any of the crimes, he soon began to discuss his involvement in various robberies. Among other things, he indicated that he had been involved in a robbery at a "Sugar Creek” store on Scottsville Road. Neither Coleman nor his partner was familiar with a Sugar Creek store on Scottsville Road. They left the room, walked across the hall to crimes analysis, and retrieved a stack of at least 40 files concerning robberies that had occurred during August, September and October of 1991. They went through the stack with defendant, determined that the convenience store was really an "A-Plus” store, and used some of the other files to help defendant identify other robberies in which he had participated.
Ultimately, in addition to the A-Plus and Sal’s Birdland robberies, defendant admitted his involvement in a robbery of a Wegman’s store, and a robbery of a CVS drugstore, both on Mt. Hope Avenue. The investigators then questioned defen *739 dant about Mr. Morton’s possession of a .22 rifle, which defendant had seen Morton shoot into a garage at 12 Fenwick Street.
Investigator Coleman then began taking depositions from defendant. A deposition regarding the .22 rifle was completed at about 9:40 a.m. Coleman then interviewed defendant further until approximately 10:00 a.m. A deposition concerning the Wegman’s beer robbery was completed at approximately 10:20 a.m. After a five-minute break for defendant to use the bathroom, Coleman took a deposition concerning the Sal’s Birdland robbery. This deposition was completed at about 11:00 a.m.
At 11:00 a.m., Investigator Coleman, who had been joined by Investigator Barnes, began talking to defendant about the CVS robbery. Defendant initially denied having gone into the CVS store. At approximately 11:35 a.m., the officers learned from other police officers that defendant’s fingerprint had been found on a package of razor blades that had been left on the counter by the person who had robbed the store. At that point, defendant admitted he had gone into the CVS store. He then put his head in his hands and said nothing for about a minute.
Without any other prompting, defendant then stated, "I didn’t shoot anybody,” two or three times. Although Coleman had already mentioned the shootings of three people, he, his partner and Barnes asked defendant, "What are you talking about?” Investigator Coleman then took a statement from defendant regarding the shootings at 41 Stewart Street. The statement started at 11:40 A.M., and was concluded at 12:30 P.M.
After the first two pages of the statement were finished, Coleman gave them to defendant. Defendant read the preprinted notification and waiver portion of the statement out loud and then read the body of the statement to himself. He had Coleman correct the statement concerning the color of the jacket he had been wearing; Coleman corrected a typographical error; and defendant initialled the corrections. Coleman asked defendant if it was the truth, and defendant said, "yes.” When Coleman then asked defendant to sign it, defendant said that he would not sign it until Coleman called an attorney called Peter Paulino or Palino in the Public Defender’s office. Defendant indicated that he wanted the statement to reflect this, and Coleman typed up a third sheet of paper *740 indicating that the statement was true and that defendant would not sign it until he talked to his lawyer.
Thereafter, Coleman telephone the Public Defender’s office, and was told that Paulino no longer worked there. He informed defendant, who told him to ask for Benjamin Bruce. Coleman called Bruce, and told him that defendant had been arrested and had given statements. Bruce indicated he would be right over, and the investigators ceased talking to defendant at 12:42 p.m.
Coleman also testified that defendant did not appear to be injured, intoxicated, or under the influence of drugs, that no threats or promises were made to defendant, and that defendant never requested to speak to an attorney until the end of his last statement.
Monroe County Sheriffs Deputy John Kennedy testified that at about 2:30 p.m. on November 4, 1991, Investigator Coleman and other RPD officers brought defendant to the Monroe County Jail. Kennedy typed the time of defendant’s arrival on a city docket sheet and wrote down the charges given to him by the RPD officers. He then patted down defendant and placed him in a holding cell.
After the RPD officers had left, defendant called Kennedy over to the cell and asked him what he was charged with. Kennedy informed him that he had been charged with robbery, first degree, and that he was going to be charged with the "distillery murders.” Defendant began pacing back and forth in the cell, then turned to Kennedy and said, "Kennedy, you know me, I’m not a murderer.” He said, "I’m not the one. I knew he was going to rob them; I didn’t know he was going to kill them.”
Defendant called several witnesses to establish that he was living in the garage at 267 Elmdorf Avenue at the time. His aunt Vivian Elliott testified that defendant had a television set, a space heater, dishes, ashtrays and other items in the garage, including bags of clothing that her husband had given to defendant. Photographs depicting these various items in the garage at the time of the defendant’s arrest were received into evidence. Ms. Elliott indicated that her husband had given defendant the clothing no later than the middle of October of 1991, and that the television set had been in the garage since the beginning of football season. She stated that she had seen defendant at least every other day during the week prior to his arrest, and that he had been staying in the garage that entire time.
*741 Ms. Elliott also testified that she was present the day after the arrest when Investigator Sheridan visited the premises. Although Investigator Sheridan testified that he only recalled the couch, some bedding, and a silverware tray in the garage at that time, Ms. Elliott indicated that all of the furnishings she had described were present.
Defendant’s stepfather, Samuel Leon Hannah, also testified that the furnishings depicted in the photographs were in the garage at the time of defendant’s arrest. He indicated that defendant had been sleeping in the garage since about April of 1991, when he had kicked defendant out of the house due to a disagreement over defendant’s drug usage. Thereafter, Mr. Hannah began finding dishes and clothing in the garage, which he would bring back into the house.
At one point, Mr. Hannah caught defendant in the garage; he called the police at least two or three times. The police were able to catch defendant and arrest him, at least once. On approximately two occasions in the summer of 1991, Mr. Hannah swore out complaints so that defendant could be arrested.
In the fall, as the weather got cooler, Mr. and Mrs. Hannah argued about defendant’s use of the garage. Although Mr. Hannah did not like the idea of defendant staying in the garage, and did not agree to it, he did not call the police again. Mr. Hannah knew defendant was using the garage because he continued to clean up beer bottles and dishes in the garage in October and November.
Mr. Hannah also testified that, as depicted in the photographs, the upper half of the rear window of the garage was present in its frame on November 4, 1991 and the lower half was missing. The police officers involved in defendant’s arrest had denied that any portion of the window was present in the frame at the time.
Defendant’s mother Helen Maye Hannah testified that defendant was staying in the garage on a regular basis, because his son (who lived with her) would wake up defendant every morning to walk him to school. Ms. Hannah testified that the television in the garage was on when Investigator Sheridan and the other officer visited the premises on November 3, 1991.
She also testified concerning Investigator Sheridan’s return on November 5, 1991. She indicated that at the time, she was concerned because the media had reported her address as *742 defendant’s address. Investigator Sheridan had indicated that, if she would sign an affidavit that defendant was homeless, he would try to keep the media from reporting her address in the future. She signed an affidavit indicating among other things that defendant was homeless, and also giving Investigator Sheridan permission to search the garage.
Although none of the arresting officers was aware of any warrants, RPD Officer Jerrold F. Risley testified that there were two warrants for defendant’s arrest pending at the time he was arrested. One, signed by City Court Judge Gary Smith on September 16, 1991, reflected charges of petit larceny. The other, signed by City Court Judge Melchor Castro on October 22, 1991, charged assault in the third degree and other lesser charges. An accompanying crime report indicated that one of the lesser charges was a trespass charge arising out of defendant’s presence in his stepfather’s garage.
In addition, RPD Investigator Darwin Klotzbach, Investigator Gary A. Galetta, and Investigator Edward M. Camacho testified concerning various photo array and lineup identification procedures that were conducted involving defendant.
DISCUSSION
The parties’ dispute centers on the question whether defendant was arrested in his residence without a warrant in violation of Payton v New York (445 US 573 [1980]) and whether any subsequent statements, lineup identifications, and tangible property seized should be suppressed as a result.
I
At the outset, the People argue that, because there were two outstanding arrest warrants for defendant, there was no Payton violation when the police arrested defendant in his "home”, even though the police officers were apparently unaware of the existence of the two warrants. Relying on People v Lopez (95 AD2d 241 [2d Dept 1983]), the People argue that, just as the test for the presence or absence of probable cause is an objective one, so should the test for the presence or absence of a warrant under Payton be an objective test, not dependent upon the subjective belief of the police officers effecting the arrest.
I do not believe the analogy is appropriate. In People v Harris (77 NY2d 434 [1991]), the Court of Appeals suppressed evidence obtained after the police, with probable cause but *743 without a warrant, had arrested defendant in his home. The Court noted that, had the police obtained an arrest warrant, defendant’s right to counsel would have attached. The Court held that the police "should not enjoy greater latitude simply because they neglected to obtain a warrant, as Payton requires, and entered the apartment illegally.” (Supra, at 440.)
Had the police been aware of the two outstanding arrest warrants, the warrants could undoubtedly have been used to arrest defendant in his home. However, in light of the policy of deterring Payton violations expressed in Harris (supra), I am not prepared to encourage future Payton violations by allowing police to break into homes to arrest people without first knowing that they have valid arrest warrants. (See, People v Vasquez, 134 Misc 2d 855, 858-859 [Sup Ct, Kings County 1987].)
The question whether the police can interrogate the defendant on charges unrelated to the charges in the arrest warrants will be addressed in part IV, below.
II
The next question presented is whether the garage where defendant was staying constitutes a "home” protected by Payton. Payton’s protection covers not just traditional homes, but also residences such as hotel rooms (People v Bossett, 124 AD2d 740, 742 [2d Dept 1986], lv denied 70 NY2d 643 [1987]), and rooming houses. (People v Lott, 102 AD2d 506 [4th Dept 1984].) However, Payton has no application if a defendant is outside his home, even if he has left at the request of police. (People v Minley, 68 NY2d 952 [1986].) Thus, if defendant had been living in his mother’s home, he would not have been protected by Payton from arrest on the porch (People v Keller, 148 AD2d 958 [4th Dept 1989], lv denied 73 NY2d 1017 [1989]) or in the driveway. (See, People v Valenti, 143 AD2d 955 [2d Dept 1988], lv denied 73 NY2d 860 [1988].) Obviously, any Payton protection attached to the mother’s residence would not extend to the detached garage.
Nevertheless, defendant has raised a serious question whether the garage itself had become his "home”. The testimony that he had been sleeping in the garage for at least two months is essentially uncontradicted, as is the presence of the couch and bedding in the garage. Investigator Sheridan’s admission that he saw a silverware tray in the garage suggests that defendant was taking meals in the garage as well. *744 However, even given the presence of a television set, alarm clock, space heater, and extra clothing, most people would hardly consider defendant’s accommodations a "home”. There was no plumbing, no toilet, and no cooking facilities.
Courts in other States have grappled with the question of whether similar facilities constitute a "home.” The Connecticut Supreme Court has assumed that a homeless person had no reasonable expectation of privacy in an area under a bridge abutment where he lived (although closed containers in the area were protected). (State v Mooney, 218 Conn 85, 93-94, 588 A2d 145, 152 [1991], cert denied — US —, 112 S Ct 330 [1991] .) The Pennsylvania Superior Court has held that a "drug house” created in an abandoned storefront was not a home even though it contained a bed, sofa, and a bucket for human waste, especially when the defendant had given another address to the police. (Commonwealth v Peterson, 408 Pa Super 22, 596 A2d 172 [1991], appeal granted 530 Pa 640, 607 A2d 252 [1992]; see also, Commonwealth v Cameron, 385 Pa Super 492, 561 A2d 783 [1989], appeal denied 525 Pa 576, 575 A2d 108 [1990] [drug house with boarded windows, no bathroom, running water, or electricity was not a home, even though it contained food, a couch and an operating television set].)
Moreover, trespassers are ordinarily not protected by Fourth Amendment expectations of privacy. One who lives in a cave on public land has no reasonable expectation of privacy therein. (United States v Ruckman, 806 F2d 1471, 1473 [10th Cir 1986]; see also, Amezquita v Hernandez-Colon, 518 F2d 8, 11-12 [1st Cir 1975], cert denied 424 US 916 [1976] [squatters on public land can claim no Fourth Amendment protection].) A campsite on another person’s property is not protected. (State v Pentecost, 64 Wash App 656, 825 P2d 365 [1992]; see also, Standridge v State, 37 Ark App 153, 826 SW2d 303 [1992] , revd on other grounds 310 Ark 408, 837 SW2d 447 [1992].) The Supreme Court has held in Rakas v Illinois (439 US 128, 141-144 [1978]) that one who is wrongfully on premises cannot have a legitimate expectation of privacy. (See also, Morillo v City of New York, 178 AD2d 7, 12-13 [1st Dept 1992], appeal dismissed 79 NY2d 1039 [1992], lv denied 80 NY2d 752 [1992] [under New York law, a mere squatter as such has no due process property interest in the real property being occupied, or in continual occupancy].)
The Supreme Court in Payton looked to the language of the Fourth Amendment itself: " 'The right of the people to be *745 secure in their * * * houses * * * shall not be violated’.” (Payton v New York, 445 US 573, 589, supra.) The Court noted that the Fourth Amendment has drawn a firm line at the entrance to the house, and that, absent exigent circumstances, that threshold may not reasonably be crossed without a warrant. (Supra, at 590.) The Court drew on many sources in its analysis of the historic perspective of the amendment, including a report of an English case from 1603 allowing warrantless entry into outbuildings, but not into a dwelling house. (Supra, at 596, n 44.)
Applying these authorities, I conclude that defendant was not protected from arrest without a warrant in the garage at 267 Elmdorf Avenue. The garage was not the equivalent of a room in a rooming house, in which defendant might have walked down the hall to use the bathroom or the kitchen. The garage was never built for human habitation; it was not a " ' "ruined tenement” ’ ” protected under Payton. (Payton v New York, supra, 445 US, at 601, n 54.) Defendant had been put out of the house over six months earlier, had initially been arrested when he would sneak into the garage, and had only grudgingly been allowed to make a bed for himself there. I decline to extend the protection provided by Payton to a detached garage where defendant sleeps at the sufferance of the homeowners, no matter how comfortable defendant has attempted to make the garage. The "firm line” drawn by Payton at the entrance to the house, and recognized by the Court of Appeals in People v Minley (68 NY2d 952, 953, supra) was crossed by the defendant when he was thrown out of the house months before.
Ill
Even if there had been a Payton violation in this case, defendant’s statements appear to be sufficiently attenuated from the violation that they may not be suppressed. In determining whether a statement is attenuated from an illegal arrest, the courts must consider the temporal proximity of the arrest and the statement, the absence of intervening circumstances, and the purpose and flagrancy of the police misconduct. (People v Harris, 77 NY2d 434, 441, supra.)
In this case, the statements that were obtained from the defendant began approximately two hours after his arrest (the same time period found to support attenuation in People v Conyers, 68 NY2d 982 [1986]). Unlike the defendant in Harris *746 (supra), defendant here made no statements at the time of his arrest before having been given Miranda warnings. As in Conyers, the defendant was promptly and fully advised of his Miranda rights, after having been left alone for a long period. The police then spoke to defendant about many other charges besides the one for which he was arrested (a permissible practice, as noted in part IV, below). Finally, any police misconduct was neither purposeful nor flagrant; it appears that it simply did not occur to the police until the day after the arrest that the garage might be a home deserving of Payton protection.
Accordingly, as in People v Goodman (183 AD2d 957, 959-960 [3d Dept 1992], lv denied 80 NY2d 831 [1992]), and People v Williams (188 AD2d 573 [2d Dept 1992]), I find that the statements would have been sufficiently attenuated from any Payton violation that they need not be suppressed.
IV
As noted in point I above, defendant’s right to counsel had attached with respect to the charges which were the subjects of the City Court arrest warrants. In addition, if there were a Payton violation, it would have arisen with respect to the Sal’s Birdland robbery for which there was probable cause prior to the arrest. (The count of the indictment concerning the Sal’s Birdland robbery has been dismissed due to the insufficient evidence before the Grand Jury.) However, even if there had been no attenuation, the right to counsel which attaches to the arrest warrants, and any right to counsel which might have arisen out of a Payton violation, would not appear to require the suppression of any of defendant’s statements herein, except his statement concerning the Sal’s Birdland robbery.
A pending unrelated criminal case upon which an arrest warrant has issued does not bar the police from questioning a suspect when the suspect does not in fact have counsel on the unrelated charge. Although the right to counsel on the unrelated charge indelibly attaches upon the issuance of an accusatory instrument or warrant on that charge and in relation to that charge proscribes waiver of counsel in the absence of counsel, the unrelated charge is pertinent to the suspect’s right to counsel on a new charge only if the suspect is in fact represented by counsel on the unrelated charge. (People v Kazmarick, 52 NY2d 322, 324 [1981]; see also, People v Bing, *747 76 NY2d 331, 340-341 [1990].) There was no indication that defendant had counsel on the charges covered by the City Court warrants (nor for that matter on the Sal’s Birdland charge). Thus, the right to counsel which arose out of the City Court warrants did not cover the charges which are the subject of this indictment.
Likewise, any Payton violation with respect to the Sal’s Birdland robbery would not appear to preclude police questioning on the other robberies and the murders. As noted earlier, suppression after a Payton violation is based on the premise that the police should not enjoy greater latitude simply because they neglected to obtain a warrant and entered a home illegally. (People v Harris, supra, 77 NY2d, at 440.) Even assuming that the police here should have obtained a warrant as to the Sal’s Birdland robbery, had they done so, they still would have been entitled to question defendant as to the other robberies and the murders. The fact that defendant is alleged to have taken part in all of the crimes with the same accomplice does not appear to render the crimes sufficiently related that a right to counsel on the Sal’s Birdland robbery count would preclude questioning on the other counts. (People v Taylor, 27 NY2d 327 [1971]; see also, People v Bing, supra, 76 NY2d, at 340.) Denying the police the fruits of any interrogation regarding the Sal’s Birdland robbery would deny them any latitude they acquired through any Payton violation; suppression of the statements as to the other crimes would not be required.
V
Finally, it does not appear that defendant’s identifications and his statement to Deputy Kennedy should be suppressed. As to the identifications, the proof established that neither the photo arrays nor the lineups were suggestive. Even though defendant’s right to counsel had attached prior to the defendant’s statements to Deputy Kennedy, it appears that the statement was spontaneous, under cases such as People v Rivers (56 NY2d 476, 480 [1982]); People v Lynes (49 NY2d 286, 295 [1980]); People v Brown (161 AD2d 778 [2d Dept 1990], lv denied 76 NY2d 891 [1990]), and People v Coleman (142 AD2d 586 [2d Dept 1988]). It does not appear that the defendant’s statements were made during the course of an extended discussion between himself and Deputy Kennedy. (Cf., People v Lucas, 53 NY2d 678, 680 [1981], rearg denied 54 NY2d 642 *748 [1981], appeal after remand 105 AD2d 545 [1985], cert denied 474 US 911 [1985]; People v Nichols, 163 AD2d 904 [4th Dept 1990].)
Defendant argues that the third page of his statement concerning the Stewart Street shootings should be suppressed, because it contains statements made after he had invoked his right to counsel. I agree that Investigator Coleman’s testimony established that the statements were made after defendant had told Coleman he would not sign the written statement without first talking to his attorney. Although Coleman testified that defendant wanted the statements added to the written statement, once defendant had invoked his right to counsel, the decision whether to add the statements was for his counsel to help him make.
CONCLUSION
For the reasons set forth above, the third page of defendant’s statement concerning the Stewart Street shootings is hereby ordered suppressed. In all other respects, defendant’s motions to suppress are denied.